PORT OF PORTLAND v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 7, 1910. Rehearing Denied March 7, 1910.)

No. 1,654.

COLLISION (§ 46*) — STEAMER AND DREDGE IN TOW MEETING — VIOLATION OF RULES.

The lighthouse tender Manzanita, proceeding down the Columbia river from Portland at night after starting upon a course from a point on the Washington shore toward a light farther down on the opposite shore, saw the lights of the dredge Columbia two points on her starboard bow, and also the,lights on a string of pontoons supporting her discharge pipe extending to her right for about a thousand feet. The dredge carried no running lights, and the officers of the Manzanita supposed her to be anchored or at work, and that her discharge pipe extended to the Washington shore and closed the channel on that side, and therefore decided to pass to the left of her. The dredge was in fact being moved slowly up the river by a tug on her starboard side, whose lights could not be seen from the Manzanita, and her pontoons were trailing behind. After approaching to within a half mile or less, and finding the dredge across the course, the Manzanita signaled her intention to pass starboard to starboard and starboarded her helm, but received no answering signal.

*For other cases see same topic & § NUMBER in Dec. & Am, Digs. 1907 to date, & Rep'r Indexes

Shortly after the vessels came into collision. *Held*, that the dredge and her tug were both in fault for not carrying proper lights to show that the dredge was in motion and for not answering the signal, and that the Manzanita was also in fault for not discovering before reaching the dredge that she was in motion and keeping to the right, as required by the rules.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 52; Dec. Dig. § 46.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the District of Oregon.

In Admiralty. Suit by the United States against the Port of Portland. Decree for libelant, and respondent appeals. Reversed.

See, also, 147 Fed. 865.

Williams, Wood & Linthicum, for appellant.

John McCourt, U. S. Atty.

Before GILBERT and MORROW, Circuit Judges, and HUNT, District Judge.

GILBERT, Circuit Judge. The appellee brought a libel against the appellant to recover damages resulting from a collision between the lighthouse tender Manzanita, a steam vessel, belonging to the appellee, and the dredge Columbia, then being navigated on the Columbia river by the tug John McCracken, both of which latter vessels belonged to the appellant. The collision occurred at about 6:45 o'clock p. m., October 6, 1905, at a point about 2.15 miles below Waterford, Wash. The dredge Columbia was a scow-shaped craft 265 feet in length, and at the time of the collision had a draft of from 6 to 8 feet. She carried a cutter extending about 30 feet beyond her bow, for loosening the substance of the bed of the stream while dredging. The height of the dredge and its superstructure was 24 feet 8 inches above the water line, and her pilot house extended 2 feet 10 inches still higher. She carried astern, for the purpose of discharging the spoil when dredging, a pipe of an aggregate length of from 900 to 1,000 feet, sustained upon a line of 27 pontoons. While dredging the cutter was lowered to the bed of the stream, and the line of pontoons extended across the channel at about right angles, so as to deposit the spoil in shoal water near the shore. When the dredge was being towed, the pontoons extended in a line astern. The tug John McCracken was about 90 feet in length, and the top of her pilot house was about 22 feet above the water line. At the time of the collision she carried running lights in screens upon either side of the pilot house. The Manzanita was 152 feet in length and was drawing 11 feet 4 inches aft, and about 6 feet 6 inches forward at the time of the collision.

For some time prior to the date of the collision, the Columbia had been engaged in dredging at a point about 3¾ miles below the point where the collision occurred. About 4 p. m. on that day she was taken in tow by the tug, which was fastened to her starboard quarter, while a wood scow was placed in front of the tug. At that time the tide was ebbing. At the time of the collision it had commenced to flood slightly.

*For other cases see same topic & § NUMBER in Dec & Am. Digs. 1907 to date. & Rep'r Indexes

Slow progress was made, a mile the first hour, a mile and a half in the second, and about a mile and a quarter in the last three-quarters of an hour immediately preceding the collision. The Manzanita left Portland at about 1 p. m. on that day, with orders to proceed to Astoria. She made from 9 to 10 knots an hour until she arrived abreast the Waterford Post Light on the Washington shore. From that point the ordinary course pursued by navigators of the Columbia river is to proceed beyond the light from a quarter to a half mile, then to head directly for Westport Reach Light on the Oregon shore, a light which stands slightly higher than the surface of the water. The master of the Manzanita testified that, after passing the Waterford Post Light, he directed the vessel's course directly for the Westport Reach Light, and almost immediately thereafter he and the mate sighted the dredge, which to them appeared to be at anchor or engaged in dredging. They saw the train of pontoons in the wake of the dredge on which were distributed seven lights, and they assumed that the starboard channel was thereby closed. They decided to pass the dredge on her starboard side. Owing to the height of the dredge, the running lights on the tug were not visible to a vessel coming down the river, and approaching her port side. The dredge herself carried no running or navigating lights, but had an electric white light above the pilot house and two lanterns attached beneath the same, and her staterooms and working rooms were brightly lighted up. The point of collision was from 200 to 300 feet instream from the upper end of two fish traps located upon the Oregon side of the river, which extended into the stream about 500 feet. As to what occurred between the time when the master and the mate of the Manzanita discovered the dredge and the time of the collision, there is some uncertainty in the testimony. There can be no question that the officers of the Manzanita believed the dredge to be at anchor, and believed that her line of pontoons extended across the starboard channel. As the Manzanita approached the Columbia at a distance variously estimated by her own officers at from slightly less than half a mile to two ship lengths, she blew two whistles as a signal that she would pass the dredge starboard to starboard. There was no answer from the tug or from the dredge. The helm of the Manzanita was put astarboard, so as to change her course two points to port, and very shortly thereafter the collision occurred.

At the time when the captain and the mate of the Manzanita first sighted the dredge, the latter was about two miles away, and they testified that the Manzanita had been put upon her course toward the Westport Light. They both testified, also, that, when they sighted the dredge, she was two points on their starboard bow. The court below rejected this testimony as incredible, and reasoned that if the Manzanita, after passing the Waterford Light, was headed toward the Westport Light, to place the position of the dredge two points on the Manzanita's starboard bow would be to place her near the Washington shore, a position which she could not possibly have occupied. We are not convinced that the testimony should be rejected on this line of reasoning. It is not improbable that the officers of the Manzanita, who never had navigated the Columbia river at night, and had had no particular occasion to observe the shore lights, may have mistaken the

light on one of the fish traps for the Westport Light.   In that case
the dredge would have been, as they testified that it was, about two
points on their starboard bow.   That their testimony was not inad-
vertently given is indicated by the fact that Capt. Byrne in that connec-
tion explained to the court that a point was 11 degrees and 15 minutes.
There is corroboration of this view of the course of the Manzanita in
the statement of the mate, who testified that he did not remember see-
ing the Westport Light until about the time when the Manzanita sig-
naled the dredge, and that then he saw the light clear in front of or
across the bow of the dredge.   It was impossible for him at that time
to have seen the Westport Light in that position, because the dredge
had long since intercepted the course from the Waterford Light to
the Westport Light, and, if he saw a light across the bow of the
dredge, it must have been some other than the Westport Light.

But whether or not they were mistaken as to the light to which their
course was directed is not of particular importance.   Whether it was
the Westport Light or some other light mistaken for it, it is obvious
that the Manzanita had before her an unobstructed course at the be-
ginning of which the dredge was on her starboard bow, and it is un-
disputed that the Manzanita, after heading for a light on the Oregon
shore, changed her course but once before the collision.   Both the cap-
tain and mate testified that, when the Manzanita had approached within
a distance of between a quarter of a mile and a half mile of the dredge,
the Manzanita was slowed down and her engines were stopped, after
which she blew two whistles as signals to pass the dredge starboard to
starboard, and about two seconds thereafter starboarded her helm two
points, so that the dredge then bore three or four points on her star-
board bow, and that they continued on that course until the collision,
expecting to pass the dredge at a distance of 200 or 300 feet from her
bow.   The mate testified that he discovered that there was going to be
a collision when the steamer was about a ship's length away from the
dredge, and that nothing further was done to avert collision by revers-
ing the Manzanita's engines or otherwise.   The testimony of several
witnesses who were on the dredge and saw the approaching steamer is
to the effect that the latter approached head on directly toward the
dredge until within two or three boat lengths, when she turned her
course and came around directly across the bows of the dredge.   The
evidence that the Manzanita was very near the dredge when her
course was changed is confirmed by the deposition of the captain of the
Manzanita given on May 3, 1906, in which he deposed that he kept on
his course until about half a minute before the collision, and that then,
when he was about two ship lengths from the dredge, he attempted
to pass her on the Oregon side.   When, ten months later, he gave his
testimony at the trial, he testified that he was in error in so testifying
in his deposition, and that, upon refreshing his memory, he would state
that, at the time when he put his helm to starboard to pass the dredge,
he was something less than half a mile distant from the dredge.

We do not deem it necessary to attempt to reconcile this conflicting
testimony.   On either statement of the facts, and assuming that they
were as the trial court found them, it seems clear that negligence must
be imputed to the officers in charge of the Manzanita.   It is true that

the dredge was navigating the river without running lights, and that there was everything in her appearance, when the officers of the Manzanita first sighted her, to lead them to the conclusion that she was at anchor. But if the Manzanita was in fact pursuing a direct course between the Waterford Light and the Westport Light, it is evident that, very soon after that course was begun, the dredge must have intercepted the line thereof. The dredge was at that time moving at a speed of a little more than a mile and a half an hour. The Manzanita had started on that course at nine knots an hour, but from the time when she whistled she proceeded at about three knots an hour. The fact that it had become necessary to change the course of the Manzanita was proof to her officers that the dredge had changed her position and was moving upstream. It became their duty to take notice of that fact and adopt all reasonable precautions to avoid collision. And it can make no material difference at what point on her course it was found necessary to starboard her helm to pass the dredge. Whether it was at a distance of a half a mile or only 300 feet, if they had observed, as they should have done, that the dredge was moving, they could have avoided the collision.

We think that the Manzanita was at fault, also, in not turning to starboard instead of to port shortly prior to the collision. The position of the dredge and the pontoons had been materially changed in the 20 minutes which ensued after the dredge was first seen. Assuming, as it was found by the court below, that at the time when the Manzanita sighted the dredge the latter was crossing the channel to the Oregon side and was about to intersect the Manzanita's course, and that she did cross it about a half a mile from the place of collision, it must be evident that at the time of the collision the train of pontoons, which extended only 900 or 1,000 feet astern of the dredge, was well upon the Oregon side of the channel, and that, before the time when the Manzanita's helm was put to starboard, it would have been apparent to the officers of that vessel, had they taken the precaution to look, that the starboard channel was open for their passage. It was their duty to follow that channel under article 25 of the Pilot Rules, which reads:

"In narrow channels, every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

In Chamberlain et al. v. Ward et al., 21 How. 548–567, 16 L. Ed. 211, the court said:

"Failure to comply with the regulation in case a collision ensues is declared to be a fault, and the offending party is made responsible for all loss or damage resulting from the neglect; but it is not declared by that section, or by any other rule of admiralty law in the jurisprudence of the United States, that the neglect to show signal lights, on the part of one vessel, discharges the other, as they approach, from the obligation to adopt all reasonable and practicable precautions to prevent a collision. Absence of signal lights, in cases falling with the act of Congress, renders the vessel liable to the extent already mentioned; but it does not confer any right upon the other vessel to disregard or violate the rules of navigation, or to neglect any reasonable or practicable precaution to avoid a collision, which the circumstances afford the means and opportunity to adopt. * * * All we mean to decide is that the neglect of

the propellor to show signal lights did not vary the obligations of the Atlantic to observe the rules of navigation, and to adopt all such reasonable and necessary precautions to prevent the collision, as the circumstances in which she was placed gave her the opportunity to employ."

We do not overlook the rule announced in The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84, in which it was said:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

We think the fault of the Manzanita is well established by the circumstances disclosed in the evidence, and in the facts as they were found by the District Court. The belief entertained by the captain and the mate of the Manzanita that the dredge was at anchor was at the first justified. The dredge carried no red light upon her port side to indicate that she was proceeding upstream, and she was about two miles away. But we are unable to see how it was possible for those two officers of the Manzanita, who stood upon the bridge thereof from the time of passing the Waterford Light to the time of the collision, to fail to discover that the dredge was in motion. After they left the Waterford Light, it was not so dark but that they could see the Oregon shore where the Westport Light was. There was nothing to obstruct their vision of the dredge or of the shore lights. They started upon a course in which at the beginning the dredge was upon their starboard bow, and, if the dredge had been at anchor, they would have crossed her bow at a distance of at least a thousand feet. When, as they proceeded, they found that the dredge intercepted the light to which their course had been directed, they had before them clear evidence that the dredge had changed her position. Again, by taking timely observation of the starboard channel, they must have seen, before they turned their vessel to port, that that channel was then sufficiently clear to allow them to pass the dredge and pontoons port to port. Their errors in these respects were not slight errors, nor were they errors committed in extremis. They were substantial errors in navigation which contributed to the disaster, and which we think are sufficient to justify a court of admiralty in imposing upon the Manzanita one-third of the damages which resulted from the collision. The Gray Eagle, 9 Wall. 505, 19 L. Ed. 741; The Mary Morgan (C. C.) 28 Fed. 333; Briggs v. Day (D. C.) 21 Fed. 727.

We find no ground for disturbing the amount of the damages which the court below found that the appellee sustained as the result of the collision. But we are of the opinion that the injuries received by the Manzanita from the collision and the damages resulting to her owner therefrom were caused by concurring and co-operating faults of the dredge, the tug, and the steamship, and that they should be borne equally by each.

The decree is reversed, and the cause is remanded, with instructions to enter a decree as herein indicated.