# THE THIELBEK.

## (District Court, D. Oregon. November 16, 1914.)

### Nos. 6111, 6116, 6129, 6130.

1. COLLISION (§ 91*) — STEAM VESSELS MEETING — FAILURE TO COMPLY WITH PASSING AGREEMENT.

A collision in the Columbia river off Astoria, in the early morning, between two meeting steamships, the one passing up in tow alongside of a tug, *held* due solely to the fault of the downbound vessel, which, after her signal for passing starboard to starboard had been assented to, instead of carrying out the agreement, stopped and reversed without signal to the other vessel, and swung around directly in the course which the tug with her tow was required to take to comply with the agreement.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*]

2. COLLISION (§ 125*)—LIABILITY—SUFFICIENCY OF EVIDENCE.

Where the fault of one vessel is clear, and sufficient to account for a collision in order to hold the other liable, in whole or in part, her negligence must be clearly shown.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 266–279; Dec. Dig. § 125.*]

3. ADMIRALTY (§ 19*) — COLLISION (§ 115*) — JURISDICTION — NEGLIGENCE OF PILOT—LIABILITY OF PORT OF PORTLAND.

The port of Portland, a municipal corporation, with authority under the laws of Oregon (L. O. L. § 6106) to maintain a pilotage service, is liable for a collision due to the negligence of one of its pilots, and its liability is governed by the general admiralty law, and cannot be limited by state statute.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 233, 234; Dec. Dig. § 19;* Collision, Cent. Dig. §§ 244–247; Dec. Dig. § 115.*]

In Admiralty. Suits by Wilhelm Wilhelmsen against the steamship Thielbek and the Port of Portland, by the steamship Thielbek and Knohr & Burchard against the Port of Portland and the steamship Thode Fagelund, and by E. de Nemour-Du Pont Powder Company and by W. R. Grace & Co. against the Thielbek and the Port of Portland. Causes consolidated. Decree against the Fagelund and the Port of Portland.

See, also, 211 Fed. 685.

W. C. Bristol, of Portland, Or., for Wilhelmsen and Thode Fagelund.

Wirt Minor, of Portland, Or., for the port of Portland.

Erskine Wood, of Portland, Or., for Knohr & Burchard and The Thielbek.

Zera Snow and MacCormack Snow, both of Portland, Or., for cargo.

BEAN, District Judge. About half past 3 o'clock on the morning of August 24, 1913, a collision occurred in the harbor of Astoria between the German bark Thielbek, in tow of the tug Ocklahama, belonging to the port of Portland, and the Norwegian steamer Thode Fagelund, in charge of one of the pilots of the port. The night was dark, but clear. Both vessels were greatly damaged, and the owners

of the Fagelund's cargo suffered loss on account of the collision. The owners of the Fagelund libeled the Thielbek in rem and the port of Portland in personam, the owner of the Thielbek libeled the Fagelund in rem and the port of Portland in personam, and the owners of the cargo libeled the Thielbek in rem and the port of Portland in personam. These actions were, by stipulation of parties, consolidated for trial and heard on the pleadings and proof.

The Thode Fagelund is a steel steamship 350 feet long, 50 feet beam, and 4,355 gross tonnage. At the time of the collision she was proceeding to sea drawing 25 or 26 feet of water, with a cargo of lumber, piling, and other merchandise, in charge of Pilot Nolan, an employé of the port of Portland, who controlled her navigation. She had come down the river the evening before, and anchored in the harbor on the same side of the fairway and about 1,000 or 1,500 feet above the government dredge Chinook, which was riding at anchor opposite the upper end of the O. R. N. dock, and on the opposite side of the channel, leaving a clear passage way of 800 or 900 feet between the stern of the dredge when athwart the stream and the dock.

The evidence of those on board the Fagelund is that about 3:20 in the morning she weighed anchor and started down the harbor against a flood tide and under a slow bell and a starboard helm. At that time the stern of the Chinook was swinging with the tide to the north side of the channel, and it was necessary for the Fagelund to bear to her port in order to get around the dredge and into mid-channel; that she thus proceeded for five minutes, when her helm was steadied and an order given for half speed ahead, and the ship headed to a point on the Astoria side a short distance below the Callendar dock, and to clear the stern of the dredge about 100 feet. She continued on this course and speed until about a ship's length above the dredge, when the lights of the Ocklahama and her tow were observed over the dredge, about one-half or three-quarters of a point off the Fagelund's starboard bow, coming up the river on the Astoria side, showing both red and green lights. The vessels were then about 1,400 or 1,500 feet apart. The pilot of the Fagelund promptly blew two blasts of his whistle and put his helm hard astarboard (where it remained until the collision), but, receiving no answer, stopped his engines, and a few seconds later, estimated to be 10 or 12, repeated the signals, which were promptly answered by the Ocklahama; but, as the Ocklahama did not appear to change her course, the Fagelund, within 5 or 6 seconds after the exchange of signals, ordered her engines full speed astern, causing her bow to swing to starboard, blew four blasts of her whistle, and, after the engines had been backing for about a minute and a half, dropped her port anchor, and almost immediately she was struck on the port bow a few feet from the stern by the bow of the Thielbek which plowed into her some distance almost on a line fore and aft.

The Thielbek is a sailing vessel 300 feet long, 45 feet beam, and was drawing 13 feet 6 inches. About 3 o'clock on the morning of the accident the tug Ocklahama, with the Thielbek lashed to her starboard side, left the anchorage ground in the lower harbor and

started up the river. The evidence of those on board the Thielbek and the Ocklahama is that their course was along the south side of the harbor, 150 or 200 feet from the docks, and 600 or 800 feet south of the stern of the Chinook; that when about 150 feet off, and a short distance below the Callendar dock, the green light and range lights of the Fagelund came into view over the dredge Chinook about two points off the port bow and about 1,200 or 1,500 feet distant; that the Ocklahama was immediately slowed down to half speed; that within the time it would take to count 10 the two blasts of the Fagelund's whistle were heard, but were not answered, because the signals were unusual, indicating a starboard to starboard passage, and it was thought wise to wait for her to come out from behind the dredge, in order to more accurately ascertain her position and intention; that at the time the first signals were given the Ocklahama with her tow was swinging slightly to port; that as soon as the Fagelund came out from behind the dredge two whistles were given by her and promptly answered by the Ocklahama; that the helm of the Ocklahama was immediately put to starboard and she began to swing to port; that at the time the Fagelund was sighted she showed her green light, and her range lights were open; that the range lights began to close up, whereupon the engines of the Ocklahama were stopped and put full speed astern under a port helm, in order to give the Fagelund time to make the passage before the Ocklahama would come up to the Chinook; that just shortly before the collision the red light of the Fagelund appeared and her anchor was heard going down; that the engines of the Ocklahama were backing full speed astern at the time, but it was impossible to avoid a collision.

[1] Under these circumstances the Fagelund was, in my judgment, alone at fault. She was navigating in a narrow channel, and, according to the testimony on her behalf, both side lights of the opposing vessel were in view. She therefore should have signaled for a port passage (Pilot Rules 4 and 10), unless the special circumstances rendered a departure from the rules necessary (Pilot Rule 11). It may be and probably is true that her close proximity to the Chinook when the Ocklahama was sighted, the necessity of her going to port to clear the dredge, and the difficulty of thereafter swinging to starboard against the tide, justified a departure from the rules; but the signals given were unusual, and clearly excused the pilot of the Ocklahama from answering them until the Fagelund came out from behind the dredge, and did not justify her in failing to attempt to execute the maneuver agreed on. It was negligence on her part to stop and back after the passing signals (The Nutmeg State [D. C.] 62 Fed. 847; The St. Johns [D. C.] 34 Fed. 763), and especially without giving the blasts of her whistle indicating that she was so doing as required by the pilot rules.

It is manifest from the testimony, and substantially admitted by Nolan, that at the time of the exchange of the signals there was room to pass safely in accordance therewith, if he had kept on his course and the Ocklahama had obeyed the signals. It is claimed, however, that the Ocklahama did not change her course after the signals had

been exchanged. Conceding that it was her duty to do so in order to assist the Fagelund in executing the passage requested, the testimony of all the witnesses aboard the Ocklahama, as well as the physical facts, shows that she did swing to port. At the time the signals were given and exchanged, the Ocklahama and her tow were passing up the south side of the channel, 150 or 200 feet from the docks, and the point of collision is estimated by the witnesses to have been from 50 to 150 feet off the dredge Chinook, and from 700 to 800 feet from the O. R. N. dock. If the Ocklahama had continued on the course she was pursuing at the time the signals were exchanged, she would have passed at least 300 or 400 feet south of the place of collision, and it is therefore evident she must have changed her course to port to that extent in going a distance of 1,000 or 1,200 feet.

Many other faults are alleged against the Ocklahama, such as that she did not maintain an efficient lookout, that she did not give one blast of her whistle when she first sighted the Fagelund, that she failed to answer the Fagelund's first signal, that her pilot was incompetent and inexperienced, that she had a red light on her own port side and that of her tow, that she was navigating at an unusual rate of speed and on a varying helm, and the like; but these are either not sustained by the testimony or did not contribute to the collision. The evidence shows that her pilot was experienced and competent, that she was excused from answering the first signal, that she observed the Fagelund as soon as she could be seen on account of the Chinook, that she was navigated at an ordinary and reasonable speed, that her failure to give one blast of the whistle when she first sighted the Fagelund was not negligence, and that the red lights on the Ocklahama and Thielbek, if there were more than one, did not in any way confuse or mislead the Fagelund. The collision was due entirely to the fact that the Fagelund, after asking for and receiving permission to cross the bow of the Ocklahama, failed to execute such movement, but, on the contrary, reversed her engines, and swung to her own starboard, directly across the course she had assigned to the Ocklahama a few seconds before. Her fault was sufficient to account for the accident, and she is not permitted to escape liability by raising a doubt regarding the movements of the Ocklahama.

[2] In order to hold the latter liable, in whole, or in part, her negligence must be clearly shown. Any doubt arising from her movements, or the contribution of her faults, if any, to the collision, should be resolved in her favor. The Victory & The Plymothian, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; The North Point (D. C.) 205 Fed. 958. There is no doubt in my mind that, if the Fagelund had continued on the course she had indicated she desired and intended to take, the collision would have been avoided. She was struck on her port bow almost head-on, showing that if she had gone but a short distance to port, as she signaled she intended to do, the Ocklahama and her tow would have passed in safety. Nor do I think the acts of the pilot of the Fagelund in these respects can be considered mere errors of judgment which any prudent and skillful navigator might have made under the same circumstances. The condition was one of his own seeking. He had asked for and been granted the right to a starboard passage. He did

not execute the maneuver. If he had kept on the course he himself had asked for, and not changed his mind and reversed within five or six seconds after the exchange of signals, he would have had 500 or 600 feet of clear water to go through. He deliberately selected his course, and it was his duty to follow it, and the opposing vessel had a right to rely upon his doing so. He not only failed to execute the maneuver, but reversed and backed, making the carrying out of the passage he had asked for impossible. He did not even warn the Ocklahama that he was backing, as required by the pilot rules. Having thus committed a positive breach of statutory duty, it is incumbent upon the Fagelund to show, not only that her fault did not contribute to the disaster, but that it could not have done so. Yang-Tsze In. Ass'n v. Furness, Withy & Co., 215 Fed. 863, 132 C. C. A. 201; the Beaver (D. C.) 197 Fed. 866. She cannot excuse herself by throwing doubt upon the movements of the opposing vessel.

[3] Nolan was an employé of the port of Portland, and it is liable for a maritime injury due to his negligence. U. S. v. Port of Portland (D. C.) 147 Fed. 865. Port of Portland v. U. S., 176 Fed. 866, 100 C. C. A. 336. It is claimed, however, that the liability of the port, as far at least as parties with whom it contracts for pilotage or towage service is concerned, is limited to $10,000 by the statute creating it. Lord's Laws of Oregon, § 6108. This question was carefully considered on exceptions to the answer in this case, and the court ruled that the extent of the liability of the port of Portland for negligence of its pilots causing a maritime tort is governed by the general admiralty law and cannot be limited by state statute. The Thielbek (D. C.) 211 Fed. 685. Although I have re-examined the question in the light of the argument of the proctor for the port, I find no reason for changing my views.

Decrees may be prepared in accordance with this opinion, the amount of damages to be hereafter determined by the court or through a commissioner, as the parties may elect.