CITY OF CHICAGO v. WHITE TRANSP. CO.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1917.)

No. 2421.

1. MUNICIPAL CORPORATIONS ☜723—LIABILITY FOR MARITIME TORT—EFFECT OF STATE LAW.

A suit in admiralty may be maintained against a municipal corporation for a tort, if a cause of action is stated under the maritime law, although the same acts of its servants would not constitute a cause of action under the local state law.

2. MUNICIPAL CORPORATIONS ☜853—LIABILITY IN ADMIRALTY—MARITIME TOOL.

Libelant's steamer was tied up for the winter in the Chicago river, when on a very cold night a fireboat owned by the city, in fighting an elevator fire on the bank, located near the steamer, so handled its apparatus that her hold was filled with water and her deck and side coated with ice, causing her to sink. *Held*, that the injury was maritime, for which, if due to negligence, the city was liable in admiralty.

3. MUNICIPAL CORPORATIONS ☜853—LIABILITY FOR TORTS—NEGLIGENCE OF SERVANTS.

Evidence that the fireboat unnecessarily remained in its position, with knowledge by its captain that the steamer's hold was filling and she was listing more and more from the accumulating ice, and that it was moved only because of fear of injury from the sinking steamer, *held* to sustain a finding of negligence.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in admiralty by the White Transportation Company, owner of steamer Arizona, against the City of Chicago. Decree for libelant, and respondent appeals. Affirmed.

Chester E. Cleveland, of Chicago, Ill., for appellant.

Charles E. Kremer, of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and ALSCHULER, Circuit Judges.

BAKER, Circuit Judge. [1] I. Appellee's steamer, the Arizona, was sunk in the Chicago river through the alleged negligence of the city's servants in the management of one of the city's fireboats. By the law of Illinois a municipal corporation is not liable to the owner of property for negligence of firemen in the performance of their duty. This, of course, applies to acts within the sovereign dominion of Illinois. In the case of Workman v. New York City, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314, it was held that for every maritime tort there is redress if the admiralty court has jurisdiction of the offending person or thing; that, though a libel in personam is not maintainable against a sovereign, it is not for lack of a cause of action in admiralty, but on account of the sovereign's immunity from process; that a municipal corporation, like private corporations and persons within the reach of the court, is subject to process; and therefore that a municipal corporation must respond to a libel in personam if a cause of action is stated under the maritime law, although the same acts of its serv-

ants would not constitute a cause of action under the local law of the state. So the present libel in personam was a proper proceeding.

[2] II. At the close of navigation, the libel alleged, the Arizona was laid up for the winter at a dock on the east side of the Chicago river; that one night in midwinter a fire broke out in a grain elevator located on the west bank of the river, northwest of the Arizona; that a gale was blowing from the northwest, and the thermometer registered below zero; that the fireboat negligently took a position in the river near the Arizona, and negligently operated and continued to operate the fire apparatus in such a way that the water therefrom ran into the Arizona's hold, and also formed large masses of ice on her decks, cabins, rails, and port side, so that she began to list to port, and finally sank, all without fault of the libelant. The damages asked were the expenses of raising and repairing her.

Do these allegations exhibit a cause of action? In the Workman Case and in the other citations by appellee (Thompson Navigation Co. v. City of Chicago [D. C.] 79 Fed. 984; Philadelphia v. Gavagnin, 62 Fed. 617, 10 C. C. A. 552; The Major Reybold [D. C.] 111 Fed. 414; Port of Portland v. United States, 176 Fed. 866, 100 C. C. A. 336; Island Transportation Co. v. Seattle [D. C.] 205 Fed. 993), the injuries to the libelants' vessels occurred through collisions; that is, the negligence of the municipal corporations was in the operation of their vessels as vessels. Here, it is to be observed, the sole negligence charged consisted in bringing the fire apparatus so near the Arizona, and operating it in such a way, as to cause her to sink. No direct precedent has been cited by counsel or found by us; and so the question must be answered in the light of analogies. If the damage to the Arizona had resulted from the operation of fire apparatus located upon the banks of the river, a different question would be presented. Here, however, not only the Arizona, but also the instrumentality which injured her, was upon the navigable waters of the United States. In the federal license of the fireboat there were no provisions which would exempt the city of Chicago from any maritime liability which under the same circumstances would fall upon a private corporation or individual. It would therefore seem that, following in the line of the principles declared in the Workman Case, a municipal corporation is liable for any negligent act, committed on navigable waters, which would render any private corporation or any individual liable. And as to these latter, liability is created not merely by the negligent handling of their vessels, but as well by the negligent setting in motion of any force from their vessels which causes an injury to another vessel upon navigable waters. In The Chickasaw (C. C.) 41 Fed. 627, a steamer, moored to her wharf and with her furnaces fireless, cut loose a coal flat which was lashed to her side; the coal flat was carried down by the current of the river and drifted against and injured the libelant's vessel; and the decision turned on the question whether under the evidence the act of the Chickasaw's mate in setting the coal flat adrift was a negligent act. Very obviously the movements of the Chickasaw herself were not involved; but the injury to the libelant's vessel was caused by the impact of the coal flat. In The Clarita, 23 Wall. 1, 23 L. Ed. 146, a privately owned fireboat negligently permitted a burn-

ing vessel, which the fireboat had taken in tow, to get loose and to drift near and set fire to the libelant's bark. The negligence charged and proven consisted not at all in the lack of proper equipment or of proper management of the fireboat as a vessel; it consisted in the failure to provide fireproof hawsers which would have enabled the fireboat to prevent the burning vessel from escaping and communicating fire to other vessels. If any analogies may be drawn from these citations to the present case, they certainly are not as close as might be desired; but we believe that they justify, if not require, the application of the Workman decision to the present libel.

[3] III. The Arizona was tied with chains to a dock on the east side of the river about 200 feet east southeast of the burning elevator which was on the west side of the river. South of the burning elevator about 75 feet was the Minnesota elevator which the fire marshal had instructed the captain of the fireboat to save. Many other men and apparatus were engaged in other assigned tasks in the general effort to subdue and prevent the spread of the fire. A gale of 40 miles an hour was blowing from the northwest. The fireboat tied a forward line to a vessel lying south of the Arizona and an aft line to the Arizona, so that the fireboat lay on the port quarter of the Arizona. From this position the fireboat threw water on the south wall and the south portion of the east wall of the burning elevator. Spray from the nozzles was blown upon the aft part of the Arizona, water flowed through her hatches into her hold, and ice formed on the port side of her deck and cabins. She soon began to list, and finally, under the weight of ice 9 feet thick and of the water in her hold, she snapped her chains and sank.

The fireboat began her operations about 10 p. m. and continued fast to the Arizona until about 4 a. m. The Arizona sank about 7 a. m.

In the testimony of the captain of the fireboat and of one of his men, it was claimed that when they arrived the Arizona was already listing; that on examination her hold was found to contain a large quantity of water; and that, as she continued to list, water came into her through seams in her port side above the water line. But the testimony respecting the Arizona's condition before and after the sinking clearly establishes that the sole cause was the water from the nozzles of the fireboat, and the claim to the contrary is not now urged by appellant.

One contention of appellant is that the absorption of the men in fighting the fire, together with the darkness and smoke, prevented them from noticing and appreciating the increasing peril of the Arizona. Not long after the fireboat had been in operation the captain observed the listing and sent men on board the Arizona. These men, at the captain's direction, put in siphons to draw water from the hold. And the captain saw that water was being thrown in faster than it was being taken out; that she was sagging at the stern and listing to port more and more; and that "there was ice only at the aft part of her (right where the fireboat was), there was no ice forward at all, because there was no chance for ice there." And when he finally quit the Arizona it was because her condition was such that he thought she might break her chains at any moment and imperil his fireboat.

Appellant's principal argument on the evidence is that the position taken by the fireboat was "necessary and the only one suited for the purpose of effectually extinguishing the fire and protecting adjoining property." The captain and others, as experts, gave that as their opinion, and there was no expert testimony to the contrary. The reason given for the opinion was that thus the streams of water could be thrown directly against the wind and that this method was the most effective. If that be accepted as true, nevertheless the inquiry must be extended to the subsequent circumstances as the continually increasing peril to the Arizona became apparent. From the portion of the captain's testimony quoted in the preceding paragraph, it is evident that the range of spray from the fireboat's nozzles was comparatively limited. Would a reasonably prudent person have persisted or would he have changed his position? It would seem that a comparatively slight shifting of position would not have materially interfered with the execution of the fireboat's assignment to save the Minnesota elevator. Further, according to the undisputed testimony of a witness, about 1 a. m. "the wind changed around from the northwest into a west direction and it changed the course of the fire." So, according to the captain's theory of the greatest effectiveness, he continued in a relatively ineffective position for several hours before leaving the Arizona; and it was during those hours that the Arizona came to the point of imminent peril. It was only on account of the resulting peril to his fireboat that the captain left and went to the east side of the river to continue his operations. And at that time, according to the captain's own testimony, the fire "was darkened down, under control, well under control." If in the first hours the raging blaze prevented him from going to the east bank opposite the Minnesota elevator, it would seem reasonable to infer that during a material time preceding 4 a. m. he could at least have made the slight shift necessary to avoid the further loading of the Arizona with water and ice, because the condition of having the fire "darkened down and well under control" was not an instantaneous occurrence at 4 a. m.

The principle for guidance was:

"Where the danger is great, the greater should be the precaution, as prudent men in great emergencies employ their best exertions to ward off the danger." The Clarita, supra.

But the record impresses us that the captain believed that for any damage he did in operating the fire apparatus no action would lie, and that he acted accordingly.

There is no contention that appellee was in any way at fault.

Our conclusion is that the evidence sustains the charges of negligence laid in the libel.

The decree is affirmed.