THE THIELBEK. *

THE THODE FAGELUND.

(Circuit Court of Appeals, Ninth Circuit. March 5, 1917.)

No. 2769.

1. ADMIRALTY ⟜1—JURISDICTION—EFFECT OF LOCAL STATUTES.
Neither local statutes, decisions, nor other local laws can abrogate or limit the maritime law applicable to an admiralty case properly before an admiralty court.
[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 1–17.]

2. ADMIRALTY ⟜19—SUIT FOR DAMAGES—LIABILITY OF PORT OF PORTLAND—STATUTORY LIMITATION.
The provision of the Oregon law governing the port of Portland limiting its liability to $10,000 for damages caused by fault of its tugs or negligence of its pilots, L. O. L. § 6108, is not effective to limit the liability of the corporation in a suit for collision in a court of admiralty.
[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 233, 234.]

3. COLLISION ⟜115—NEGLIGENCE OF PILOT—LIABILITY OF PORT OF PORTLAND.
The port of Portland, a municipal corporation created by the laws of Oregon and authorized to furnish tugs and pilots for vessels between Portland and the sea, L. O. L. § 6106, is liable under the maritime law for a collision resulting from the negligence of a pilot so furnished to a vessel on her request.
[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244–247.]

4. COLLISION ⟜95(4)—STEAM VESSELS CROSSING—VIOLATION OF RULES.
A collision in the harbor of Astoria in the early morning between a steamship outbound in charge of a pilot and a bark in tow of a tug passing up the river held due solely to the fault of the steamship for violation of the starboard hand crossing rule, by attempting to cross ahead of the tug, which was on her starboard hand approaching obliquely, and for failure to signal when she reversed her engines, after her crossing signal had been assented to.
[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202.]

5. COLLISION ⟜21—EVIDENCE OF FAULT—VIOLATION OF RULES.
Where a vessel has committed a positive breach of a statutory duty, she must show, not only that her fault probably did not contribute to a collision, but that it could not have done so.
[Ed. Note.—For other cases, see Collision, Cent. Dig. § 18.]

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit in admiralty for collision by Wilhelm Wilhelmsen, owner of the steamship Thode Fagelund, against the bark Thielbek, Knohr & Burchard, Nfl., claimant, and the Port of Portland; also suit by Knohr & Burchard, Nfl., owner of the Thielbek, against the Thode Fagelund and the Port of Portland. Decrees against the Fagelund and the Port of Portland, from which they appeal. Modified and affirmed.

For opinion below, see 218 Fed. 251. See, also, 211 Fed. 685.

Wood, Montague & Hunt and Erskine Wood, all of Portland, Or., for Knohr & Burchard.

Rogers MacVeagh, Teal, Minor & Winfree, and Wirt Minor, all of Portland, Or., for the Port of Portland.

William C. Bristol, of Portland, Or., for Wilhelm Wilhelmsen.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. A collision in the harbor of Astoria between the steamship Thode Fagelund, owned by Wilhelm Wilhelmsen, and at the time laden and outward bound, and the bark Thielbek, owned by Knohr & Burchard, and at the time in ballast and in tow of the tug Ocklahama, going up the Columbia river from Astoria to the city of Portland, gave rise to the litigation disclosed by the record now before us. It resulted in serious damage to both ship and bark, but especially to the ship—the owners of the cargo of the latter also suffering loss. The ship was at the time in question in charge of a duly licensed pilot named Nolan, employed for the purpose by the port of Portland, and the tug, which was one of the most powerful on the river, was with its tow in charge of a duly licensed pilot named Pease, also employed for the purpose by the port of Portland.

The latter is a municipal corporation created by and organized under an act of the Legislature of the state of Oregon in the year 1891. Neither by the act of its creation, nor as subsequently amended by the Legislature of the state, was the municipality authorized to engage in the business of towage or pilotage; but in 1908, under a procedure then in force in the state, an act was proposed by initiative petition and duly adopted, whereby the port of Portland was "authorized and empowered to establish and maintain an efficient towage and pilotage service between the corporate limits of the port of Portland and the open sea." It was by virtue of the power so conferred that the port of Portland engaged in the business of piloting and towing vessels between the city and the sea, in the transaction of which business it furnished the pilot for the ship and the pilot and tug for the sailing vessel above mentioned, upon the request of their respective masters.

The ship, which was 350 feet in length and heavily laden, reached the waters of Astoria harbor the evening before the accident in charge of another pilot, and anchored at 9:40 p. m. near flash buoy No. 2, where Nolan, an experienced pilot of those waters, pursuant to an order of the superintendent of towage and piloting of the port of Portland, went on board and took charge for the purpose of piloting the ship to the open sea. At the same time the bark was at anchor in the lower harbor and also on the Astoria side, and between the two the United States barge Chinook, about 450 feet in length, was anchored on the north side of the harbor and was swinging with the tide.

About an hour after the anchoring of the ship the tug Ocklahama, belonging to the port of Portland, arrived in charge of its pilot, Pease, and was lashed to the bark for the purpose of towing the latter to the city, whereupon the two vessels, for the purpose of that navigation became one (The Columbia, 73 Fed. 226, 19 C. C. A. 436; Halvorsen Transportation Co. v. Cheda, The Seven Bells, 241 Fed. 43, —— C.

C. A. ——, decided present term), and the captain of the bark retired to his cabin, leaving the pilot, Pease, in charge. At 3:20 a. m., or thereabouts, on the same night, the ship weighed anchor and with her helm to starboard proceeded under a slow bell down the harbor against a flood tide. About 20 minutes before the ship was thus put in motion, the tug with her tow left the anchorage ground in the lower harbor and proceeded up the river, bound for Portland.

The collision occurred near the stern of the government dredge, and growing out of it were the various libels filed in the court below. The first, numbered 6111, was filed by Wilhelm Wilhelmsen, owner of the Thode Fagelund, in rem against the Thielbek and in personam against the port of Portland, in which libel it was charged that the Ocklahama and Thielbek were negligently and carelessly navigated in these particulars: (1) That the officer in charge of the Ocklahama was, in substance, inexperienced. (2) That no lookout was kept upon the Thielbek or upon the Ocklahama. (3) That the Ocklahama and Thielbek were navigated with a varying helm. (4) That the Ocklahama did not promptly answer the passing signals, or, when she did answer, did not observe and obey the same. (5) That the Ocklahama was operated at too great a speed. (6) That the Ocklahama failed to act on or observe the known position of the dredge Chinook and the fact that the Thode Fagelund was departing on an outward-bound voyage on the turn of the tide. (7) That the officers of the Ocklahama and Thielbek did not watch the compass bearing of the approach of the Thode Fagelund. (8) That when the pilot of the Ocklahama saw the red light of the Thode Fagelund he did not conduct his vessel as he should have done, so as to pass safely between the Thode Fagelund and the Railroad wharf in Astoria. (9) That the Ocklahama and the Thielbek did not give the Thode Fagelund sufficient clearway, either one side or the other, of the available open channelway.

Knohr & Burchard, Nfl., owners of the Thielbek, next filed a libel, numbered 6116, in rem against the Thode Fagelund and in personam against the port of Portland, alleging negligence substantially as follows: (1) That the Thode Fagelund approached the channel between the stern of the Chinook and the Astoria docks in such a manner that she was not under proper control. (2) That she blew two whistles and attempted to cross the bow of the Ocklahama and tow when the red light was showing to the Thode Fagelund and her own green light was only showing to the Ocklahama. (3) That after the passing signals had been given and agreed upon the Thode Fagelund altered her course to her own starboard, and crowded the Ocklahama and Thielbek so close to the Chinook as to make the passing impossible. (4) That the Thode Fagelund reversed her engines full speed astern, and did not signal by three whistles that her engines had been reversed.

In its answer to these several libels the port of Portland pleaded affirmatively the law under which it rendered the service that has been mentioned, and also pleaded this provision of the act of 1908 authorizing and empowering it to establish and maintain an efficient towage and pilotage service between the corporate limits of the port of Portland and the open sea:

"If a vessel or cargo, while being towed by a vessel owned or operated by the port of Portland, or while under the charge of a pilot employee of the port of Portland, is injured or lost by reason of the fault of such tug, or the negligence or incompetence of such pilot, the port of Portland shall not be liable for any loss or injury thereof in excess of $10,000."

The port of Portland further pleaded affirmatively that its pilots were duly licensed, and were authorized by virtue of their licenses to undertake the service which they were performing at the time of the collision, and that they were pilots of experience and familiar with the waters in which the collision occurred.

Subsequently the owner of the Fagelund was permitted to amend his libel, by alleging, in substance, that, if the accident did not occur as alleged in his original libel, it did occur through the negligence and carelessness of the pilot of the Fagelund.

Libels were also filed by the owners of the cargo of the Thode Fagelund, but, as they were subsequently dismissed and no question is here presented respecting them, no further reference to those libels need be made; nor, in the view we take of the case, need any specific reference be made to the petition filed in behalf of the Thielbek for a limitation of its liability.

The cases were consolidated for trial in the court below, but separate decrees were there entered. In so far as concern these appeals, the first decree was entered in the case numbered 6116 in the court below, which decreed that the libelant, Knohr & Burchard, Nfl., recover "against the steamer Thode Fagelund, her engines, etc., and the port of Portland, or either of them, the said sum of $12,805.26 (being the amount of damages found to have been sustained by the libelant), with interest thereon from the 20th day of October, 1913, until paid, and costs taxed at $239.49, and that the said steamer Thode Fagelund be condemned therefor, and that execution issue against the port of Portland therefor," with a provision to the effect that, should the claimant, Wilhelm Wilhelmsen, pay to the libelant on account of the decree the amount awarded therein, with interest and costs, or any part thereof, the said claimant shall recover over from the port of Portland the amount so paid to the libelant. That decree was entered June 24, 1915, and from it both the claimant, Wilhelm Wilhelmsen, and the port of Portland appealed.

The decree in the case numbered 6111 in the court below, and being the first libel filed growing out of the accident in question, was entered October 25, 1915, and decreed that the owner of the Fagelund, being the libelant in that action, "have and recover of and from the port of Portland, respondent herein, the sum of $43,804.66, with interest thereon at the legal rate from the 24th day of August, 1913, until paid," and further adjudged "that in the event the libelant, Wilhelm Wilhelmsen, pays or is required or compelled to pay the amount of the damages decreed by this court in favor of Knohr & Burchard, libelants, owners of the German ship Thielbek, in cause No. 6116, amounting to the sum of $12,805.26, with interest thereon and costs as therein decreed, then and in that event the said Wilhelm Wilhelmsen shall have and recover of and from the port of Portland all of said

sums, together with interest thereon at the legal rate until paid," and further decreed Wilhelmsen his costs taxed at $177.69.

It will be observed that in and by the decree last mentioned no disposition was made of the claim made by Wilhelmsen, as owner of the Fagelund, against the bark Thielbek, which omission was apparently occasioned by inadvertence, growing out of the absence of the Thielbek's proctor at the time of the entry of the decree and the subsequent absence of the judge, who on his return to Portland made and entered this decree on the 31st day of January, 1916, in the case numbered 6111:

"This cause having duly and regularly been heard, the libelant appearing by W. C. Bristol, his proctor, the port of Portland by Wirt Minor, its proctor, and the claimant by Erskine Wood, its proctor, and the court being of the opinion that the allegations of the libel against the German bark Thielbek are not sustained, and that the collision alleged in said libel occurred without any fault on the part of the said Thielbek, it is now considered, ordered, and decreed that the libel of Wilhelm Wilhelmsen against the said Thielbek, etc., be and the same is hereby dismissed, and that the claimant, Knohr & Burchard, Nfl., recover of and from the libelant, Wilhelm Wilhelmsen, and his stipulators, for costs and value, its costs and disbursements herein taxed at $2,247.93.                    R. S. Bean, Judge."

From that decree no appeal was taken. It will therefore be seen that the decrees before us for review are the decrees entered in case numbered in the court below 6116, brought by Knohr & Burchard, Nfl., as owners of the Thielbek, against the Fagelund and its owner, Wilhelmsen, and the port of Portland, in which the libelant was given judgment against the Fagelund and the port of Portland for the damages found to have been sustained by the Thielbek, with costs, and with the provision that has been set out to the effect that the Fagelund should recover over from the port of Portland any amount she might have to pay to the libelant under the decree, from which decree both Wilhelmsen, owner of the Fagelund, and the port of Portland, appealed.

The other decree before us is that entered in case numbered in the court below 6111, brought by Wilhelmsen, as owner of the Fagelund, against the Thielbek, her owners, and the port of Portland, in which the libelant, Wilhelmsen, was awarded, as has been seen, damages against the port of Portland in the sum of $43,804.66, with interest, and further adjudging that, in the event the libelant, Wilhelmsen, should pay or be compelled to pay the amount decreed by the court in the case numbered 6116 in favor of the owners of the Thielbek for the sum of $12,805.26, being the amount of damages found to have been sustained by the Thielbek, with interest thereon and costs as adjudged, then and in that event Wilhelmsen should have and recover of and from the port of Portland all of such sums, with legal interest until paid, from which decree the port of Portland only appealed. In saying that from the decree last mentioned the port of Portland only appealed, we have not overlooked the fact that in the assignment of errors filed by the proctor for Wilhelmsen, February 21, 1916, is the following:

"Thirty-Seventh. That the court erred in giving a judgment, order, or decree in favor of Knohr & Burchard for any amount in costs after said court had originally entered a decree in favor of the Thielbek and its owners and claimants, Knohr & Burchard, in cause 6111, from which the appellant had theretofore appealed."

Notwithstanding the latter statement in that assignment of error, the record does not show that any appeal by Wilhelmsen from the decree of October 25, 1915, was ever taken.

[1, 2] It is contended on behalf of the port of Portland that no decree against it could be entered in excess of $10,000, because of a limitation of its liability to that amount made by the Oregon law that has been cited. We are unable to sustain that contention; and we are of the opinion, as was the learned judge of the court below, that the contrary was distinctly adjudged in effect by the Supreme Court in the case of Workman v. New York City, Mayor, etc., 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314.

It is said by the proctor for the port of Portland that the question is so important that its disposition should not be based upon any one decision. It is a sufficient answer to the suggestion to say that one decision of the Supreme Court upon a point involved, so long as it stands unreversed, is as binding upon the inferior courts as a dozen; but we will add a few citations to the same general effect that neither local statutes, decisions, nor other local laws can abrogate or limit the maritime law applicable to an admiralty case properly before an admiralty court. In the case of The Chusan, Fed. Cas. No. 2,717, Judge Story said:

"In the exercise of this admiralty and maritime jurisdiction, the courts of the United States are exclusively governed by the legislation of Congress, and in the absence thereof by the general principles of the maritime law. The states have no right to prescribe the rules by which the courts of the United States shall act, nor the jurisprudence which they shall administer. If any other doctrine were established, it would amount to a complete surrender of the jurisdiction of the courts of the United States to the fluctuating policy and legislation of the states. If the latter have a right to prescribe any rule, they have a right to prescribe all rules, to limit, control, or bar suits in the national courts. Such a doctrine has never been supported, nor has it for a moment been supposed to exist, at least as far as I have any knowledge, either by any state court, or national court, within the whole union. For myself, I can only say that, during the whole of my judicial life, I have never, up to the present hour, heard a single doubt breathed upon the subject."

See, also, The Lottawanna, 21 Wall. 558, 575, 22 L. Ed. 654; Butler v. Boston Steamship Co., 130 U. S. 527, 557, 9 Sup. Ct. 612, 32 L. Ed. 1017; Schuede v. Zenith S. S. Co. (D. C.) 216 Fed. 566, and cases there cited.

[3] The further contention on behalf of the municipality that the pilot it furnished the Fagelund upon request was "not the servant of the port, but really the servant of the vessel," for whose negligence the port of Portland was not responsible, is, we think, sufficiently answered by the cases of Workman v. Mayor, etc., of New York City, supra, and U. S. v. Port of Portland (D. C.) 147 Fed. 865, affirmed by this court in 176 Fed. 866, 100 C. C. A. 336.

[4] There remains to consider the question whether the collision was caused by the faulty navigation of both the ship and the tug (with her tow), or by the sole fault of the ship, and the contention on behalf of the port of Portland that, conceding the fault to have been entirely in the navigation of the Fagelund, such fault should be attributed to error of judgment on the part of the navigator, and not to negligence.

No one questions the fact that both ship and tug knew of the presence of the dredge, anchored in the channel and swinging with the then prevailing flood tide, and further that she stood so high above the water as at times to prevent the ship and tug from seeing each other. The evidence, however, shows that they did see each other about the same time, and when they were about 1,500 feet apart. At that time they were approaching each other obliquely. It is undisputed that the tug, with her tow, was the privileged vessel, and that it was the duty of the ship to keep out of the way—especially as the latter was going against the tide, and the tug with her tow coming with it. The Syracuse, 9 Wall. 672, 675, 19 L. Ed. 783; The Galatea, 92 U. S. 439, 23 L. Ed. 727; Spencer on Marine Collisions, p. 265.

When the ship weighed her anchor and started down the harbor, she proceeded against a flood tide, under slow bell, and with her helm to starboard, the stern of the dredge swinging with the tide to the north side of the channel, making it necessary for the Fagelund to bear to her port in order to pass around the dredge. Heading for a point on the Astoria side of the harbor on a course which would enable her to clear the stern of the dredge from 100 to 200 feet, the Fagelund proceeded at a speed, according to the testimony of her officers and the report of her pilot, made in pursuance of the rules under which he was acting, not much above steerageway until about a ship's length above the dredge, at which time the lights of the tug and tow were discerned from one-half to three-quarters of a point off the Fagelund's starboard bow, coming up the river on the Astoria side and showing both red and green lights. The vessels were then from 1,400 to 1,500 feet apart. The pilot of the Fagelund at once blew two blasts of his whistle and put his helm hard astarboard, and, receiving no answer, stopped his engines, and almost immediately repeated his signals, which were then promptly answered by the tug with two whistles, meaning assent to the course so selected. As the latter did not appear to change her course, the Fagelund, within five or six seconds after the exchange of signals, ordered her engines full speed astern, causing her bow to swing to starboard, blew four blasts of her whistle, and, after the engines had been backing for about a minute and a half, dropped her port anchor, almost immediately after which she was struck on her port bow, a few feet from the stem, by the bow of the Thielbek, which cut into her almost on a line fore and aft—the ship and dredge being, at the time of the collision, almost parallel, as shown by the diagrams introduced in evidence.

Passing the question of the negligence of the Fagelund, contended for on behalf of the Thielbek, in starting from her anchorage knowing that the dredge was blockading a large part of the channel, but within a very short time would be so swung by the incoming tide as to greatly enlarge the passageway, we agree with the court below that the Fagelund committed a clear violation of rule 7 of the pilot rules, when approaching, as she was, the Thielbek and Ocklahama on a diagonal course, and, having them on her starboard, she attempted to cross their bows, instead of directing her course to her own starboard, in order to pass astern of them. The rule mentioned, so far as applicable, is as follows:

"When two vessels are approaching each other at right angles or oblique-ly so as to involve risk of collision other than when one steam vessel is over-taking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by di-recting her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse."

The contention that the Fagelund was too close to the stern of the dredge to have blown one whistle and gone astern of the tug and tow, instead of two whistles, as she did blow for the starboard passage, finds no support in the facts; for, as the speed of the Fagelund was but lit-tle, if any, more than steerageway, the mere stoppage of her engines would in all likelihood have allowed the tug and tow to have safely passed on their course. But that the reversing of her engines would have accomplished that result seems to be conclusively shown by the fact, admitted by the master of the Fagelund, that when her en-gines were reversed she came to a "practical dead stop," and was then, according to the evidence, from 125 to 200 feet from the dredge, and far from the course that the tug and tow would have proceeded on, had not the pilot of the Fagelund blown two whistles and attempted to cross their bows.

[5] Besides that, the record shows two other very distinct acts of negligence on the part of the Fagelund, which will be briefly stated. Having requested a starboard to starboard passage, which was as-sented to by the tug, the Fagelund within a few seconds, as has been said, reversed her engines and swung to her own starboard, directly across the course which she had just assigned to the tug and tow. In our opinion that was the grossest sort of negligence. Furthermore, the law required the Fagelund to give three blasts of her whistle to indicate the reversal of her engines, with which requirement she whol-ly failed to comply. It is well settled that, where a vessel has committed a positive breach of a statutory duty, she must show, not only that prob-ably her fault did not contribute to the disaster, but that it could not have done so. The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148; The Beaver, 219 Fed. 134, 135 C. C. A. 32; The Ellis, 152 Fed. 981, 82 C. C. A. 112; Davidson v. American S. B. Co., 120 Fed. 250, 56 C. C. A. 86; The Dauntless (D. C.) 121 Fed. 420; The Admiral Schley, 142 Fed. 64, 73 C. C. A. 250; Hawgood Transit Co. v. Mesaba S. S. Co., 166 Fed. 697, 92 C. C. A. 369.

We agree with the court below that the evidence fails to show that at any of the time in question the tug, with her tow, was guilty of ex-cessive speed, or that it discloses any negligence on the part of either of those vessels. It results that the decrees appealed from must be affirmed, with a slight modification in the amount awarded the Thiel-bek, growing out of a clerical error which the parties have stipulated may be corrected, involving the addition to the amount awarded the bark of $69, making the amount of the award $12,874.26, instead of $12,805.26.

The decree in the case of Wilhelm Wilhelmsen v. The Bark Thiel-bek et al. is affirmed, and the decree in the case of Knohr & Burchard, Nfl., v. The Thode Fagelund et al. will be modified, as above indicated, and, as so modified, will stand affirmed.