HAWGOOD TRANSIT CO. v. MESABA S. S. CO.

MESABA S. S. CO. v. HAWGOOD TRANSIT CO.

(Circuit Court of Appeals, Sixth Circuit. January 22, 1909.)

Nos. 1844–1845.

1. COLLISION (§ 81*)—FOG OR THICK WEATHER—FOG SIGNALS.

Rule 14 of the rules governing navigation on the Great Lakes (Act Feb. 8, 1895, c. 64, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2889]), requiring steam vessels in thick weather to sound fog signals at intervals of not more than one minute, is imperative, and a vessel is not relieved from the requirement by the fact that she is giving passing signals.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 158; Dec. Dig. § 81.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. COLLISION (§ 81*) — FOG—PRECAUTIONS REQUIRED BY RULES—SIGNALS AND NAVIGATION.

Where a steam vessel navigating in a thick fog gave four distinct passing signals to a meeting vessel, which she could not see, covering a period of six minutes or more, and received no answer to any, it was her duty, under rule 26 of the rules governing navigation on the Great Lakes (Act Feb. 8, 1895, c. 64, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2892]), to sound alarm signals, and to stop, and, if necessary, reverse, until the course and position of the other vessel could be ascertained, as required by rule 15.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 81.*]

3. COLLISION (§ 81*)—FOG—PRECAUTIONS REQUIRED BY RULES—PASSING SIGNALS.

A steam vessel navigating the Great Lakes in a thick fog, hearing a passing signal from a vessel nearly ahead and about a mile distant, had no right to conclusively assume that such signal was not intended for her, and in doing so acted at her peril; it being her duty to either answer the signal, or, if she was in doubt as to the course or intention of the other vessel, to give the alarm signal required by Rule 26, Act Feb. 8, 1895, c. 64, 23 Stat. 645 [U. S. Comp. St. 1901, p. 2892], and thereafter to act as the emergency might require.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 164; Dec. Dig. § 81.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

4. COLLISION (§ 123*) — SUITS FOR DAMAGES — EVIDENCE OF FAULT—PRESUMPTION· FROM VIOLATION OF RULES.

The fact that a ship was at the time of collision in actual violation of a statutory rule designed to prevent collisions throws the burden upon her to show that such violation could not have contributed to the collision.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 123.*]

5. COLLISION (§ 83*) — STEAM VESSELS — MEETING IN FOG — BOTH VESSELS IN FAULT.

A collision on Lake Huron in a thick fog, between two meeting steamships, held due to the fault of both for violation of the rules.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 83.*]

Appeals from the District Court of the United States for the Eastern District of Michigan, in Admiralty.

These appeals involve the question of liability (under libel and cross-libel) for a collision between the steel steamer Amasa Stone, owned by the Mesaba Steamship Company, and the steel steamer Etruria, owned by the Hawgood Transit Company, occurring in Lake Huron, off the Michigan shore, about seven miles above Presque Isle, at about 3:45 a. m., June 18, 1905. The Etruria was sunk, occasioning a total loss of $278,550.96, and the Stone incurred damage amounting to $18,831.54.

The Stone was bound down from Lake Superior to Lake Erie ports, and thus down Lake Huron. and·was laden with 10,000 tons of iron ore. The Etruria was bound up from Lake Erie to Lake Michigan ports, and thus required to pass through the Straits of Mackinac. She was loaded with 7,000 tons of coal. There was a dense fog from about midnight until after the collision, making it impossible to see the lights of a boat more than about 500 feet away. At the time when the Etruria and the Stone discovered each other, the Stone was steering southeast by east, the Etruria being about two points off the Stone's port bow, and, as the testimony indicates, steering N. W. by ¾ W., having changed abreast of Presque Isle to that course for the straits, from a previous course N. by W.; and by reason of the angle of their respective courses the Stone being about two points on the Etruria's starboard bow. Off the Stone's port-hand side and slightly behind was the Au-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rania, bound down from Duluth to Lake Erie ports, steering southeasterly, running at a speed of 9½ miles per hour, and having the Etruria about three points to starboard. The Corsica, bound up, steering north by northwest and running 14 miles an hour, was slightly to port of and a little behind the Etruria. The Maritana, also up-bound, was about one point to port of the Corsica and a little farther up. Both the Corsica and the Maritana were about abreast of the Etruria when the collision occurred. There was another boat on the port-hand side of the Etruria, but this boat does not figure materially in the controversy.

A few minutes before the giving by the Etruria of the passing signals hereafter referred to, the Stone and Etruria, as well as the other boats, had been exchanging the fog signals prescribed by rule 14, although the testimony indicates that the Etruria did not give the signals, as often as the rule requires. After these several minutes' interchange of fog signals, the Etruria gave from two to four of the two-blast passing signals provided by rule 23, indicating an election to pass to port. The navigator of the Etruria testifies that four such passing signals were given at intervals of about two minutes. The master of the Corsica heard three passing signals given by the Etruria, and says they were about three minutes apart. The Corsica's officer heard one of the Etruria's passing signals. The mate of the Aurania says he heard two two-blast passing signals, followed a little later by two short blasts just before the collision. He did not regard the passing signals as meant for him, because the Etruria was already on his starboard. The mate in command of the Stone testifies that he heard but two passing signals; that when the first was heard the Etruria was not less than a mile away and on the Stone's port-hand side—two points off to eastward. The testimony is undisputed that none of these passing signals given by the Etruria was in any way answered by the Stone, which, however, continued the fog signals, at intervals of one minute or less, until the collision. The excuse given by the Stone's officer for failing to pay attention to the passing signal is that he did not suppose the signal was meant for him, but believed that it was intended for the Aurania, it being his view that two of the up-bound boats were on his port and the other two on his starboard, and that the signals were broadening out. The testimony is undisputed that, from the time the Etruria began giving the passing signals, she entirely ceased to give the fog signals. The Stone's mate testifies that on hearing the fog signals ahead he checked his boat down to a speed of about three miles an hour, not, however, changing his course. Neither the Stone nor the Etruria gave the alarm signals required by rule 26, in case either steamer is in doubt as to the course or intention of the other; the Stone's officer giving as his explanation for not being in doubt the same reason as for failure to answer the passing signal, viz., that he supposed it was intended for the Aurania, and the Etruria's officer justifying his lack of doubt upon the proposition that some navigators do not answer the passing signals when they think they will pass clear, and he thought he was going to pass clear. The Stone's mate also testifies that when the second passing signal was received the Etruria was discovered looming up in the fog, not more than two lengths away; that the Stone's engine was immediately stopped, and at once reversed and backed hard, the collision occurring less than a minute thereafter. The Etruria's officer testifies that the collision did not occur for two or three minutes after the last passing signal was given. The Etruria's mate testifies that he came to slow check before beginning to blow the passing signals, and that after failing to receive a reply to his second signal the engine was stopped and was not again started up (being shut down five or six minutes before the collision), and that when the collision seemed imminent the helm was put hard to starboard, but that the boat failed to respond on account of lack of headway. The bluff of the Stone's bow struck the Etruria on her starboard side aft of the beam, at an angle of about 45 degrees, penetrating about two feet, the Etruria filling and going down in a few minutes. The Stone did not return to the scene of the collision until after the Etruria had disappeared and the crew had been picked up by the other boats. The testimony as to the speed both of the Stone and the Etruria immediately preceding the collision is in conflict. There is testimony indicating that both vessels were running at a greater speed than bare steerageway just

before the collision. If the testimony of the Stone's master is to be believed. that the boats were more than a mile apart when the earlier passing signal was heard two or three minutes before the Etruria came into view, the two boats must have together traveled a mile in two or three minutes. The testimony of the Stone's engineer is that his boat, after checking down at 3:21 a. m., ran at full speed until 3:38, and so must have been running at full speed for a few minutes after the Etruria's fog signal was first heard, and during the four hours of heavy fog she had averaged 9 miles an hour. The Etruria during the 4 hours' fog, when not under check, ran at a speed of about 11 miles an hour.

Judge Swan heard the testimony in open court, and at the close of the argument announced from the bench his conclusion that both the Stone and the Etruria were at fault with respect to the collision, and decree was entered holding each vessel liable for one-half the damage to both vessels, the costs to be equally divided. The appeals involve only the question of fault on behalf of the respective vessels.

H. D. Goulder and F. L. Leckie, for the Hawgood Transit Co.
H. A. Kelley, for the Mesaba S. S. Co.

Before LURTON and SEVERENS, Circuit Judges, and KNAPPEN, District Judge.

KNAPPEN, District Judge (after stating the facts as above). We are satisfied that the trial judge correctly concluded that both vessels were at fault for the collision.

As to the Etruria: By the undisputed proofs, she violated at least two of the rules prescribed for the express purpose of preventing collisions. By rule 14 (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2889]), she was required to sound as a fog signal, at intervals of not more than one minute, three distinct blasts of her whistle. It is undisputed that from the time she began to give passing signals she entirely ceased to give fog signals. The only excuse urged on her behalf for this neglect of the statutory requirement is that she had the right to and did substitute passing signals for fog signals. There is no warrant for this construction of the rules. Rule 14 relates only to "thick weather," and is independent of rule 23, which requires passing signals "in all weathers." The construction contended for offends against both the letter and the spirit of rule 14. The language of the rule is imperative, and admits of no substituted performance. Indeed, instead of there being less use for fog signals during the period occupied in establishing or seeking to establish a passing agreement, or in making the attempted change of course, the necessity for such fog signals is thereby increased. It is enough to say that rule 14 is imperative in its requirement.

The Etruria also clearly violated rule 26. The Stone made no answer to either one of the Etruria's four distinct passing signals, covering, as alleged, a period of six minutes or more. The Etruria, therefore, being unable to see the Stone, and knowing her intentions and whereabouts only by her whistles, had no right to assume merely from the Stone's silence that the latter assented to the Etruria's passing signal, and that she would act accordingly. That the Etruria was in doubt as to the Stone's course or intention is shown by the fact that she continued to blow her passing signals, apparently continuing to invite the assent of the Stone. Being in doubt as to the Stone's movements, it was the Etruria's duty to sound an alarm by giving

several short, rapid blasts of her whistle; and under the circumstances shown by this record, including the density of the fog, the number of vessels on opposite and differing courses, and the confusion and interruption of signals, cautious navigation under rule 15, in connection with the other rules, required the Etruria, in case the location and intention of the Stone could not otherwise be determined, to stop, and, if necessary, to reverse, until the exact course and position of the Stone could be ascertained. The New York, 175 U. S. 187, 201, 20 Sup. Ct. 67, 44 L. Ed. 126; The North Star, 62 Fed. 71, 10 C. C. A. 262; The George W. Roby, 111 Fed. 601, 49 C. C. A. 481. In Re The North Star, supra, the inconclusive and speculative nature of the appearance of broadening off of signals created only by sound is commented upon. The Etruria had no right to go drifting (as claimed), in this dense fog, at an angle of two points across the course of the other steamer with no further warning of her approach than a repetition, at two minute intervals, of a signal asserting that she was directing her course to port.

As to the Stone: Her fault, while not perhaps so great as that of the Etruria, is equally plain. She heard the Etruria's passing signal. Her only excuse for not replying is that she did not suppose it was meant for her, but believed it was intended for the Aurania. In so assuming, she was obliged to take it for granted that the Etruria, in view of her position in the lake, was bound for Lake Superior, and so could not be intending to pass on the Stone's starboard. There was no warrant for such conclusive assumption. The Stone's navigator had no right to thus conclusively assume that a passing signal given by a vessel but two points off her bow, and distant about a mile, was not intended for her. The City of Chester, 78 Fed. 186, 188, 24 C. C. A. 51; The Great Republic, 23 Wall. 31, 23 L. Ed. 55. The construction of the situation most favorable to the Stone is that a doubt was or should have been raised in the mind of her navigator as to the course and intention of the Etruria as affecting the Stone. Indeed, he appears to have actually had such doubt, for the Etruria's fog signals had caused him to check down his vessel. In so conclusively assuming that the Etruria's proposed change of course could not affect her, the Stone acted at her peril. It was thus the Stone's duty, upon hearing these passing signals, to either show her assent thereto, as provided by rule 23, or, if she deemed it unsafe to so assent, or if she had any doubt as to the course or intention of the Etruria as affecting the Stone—that is to say, any doubt whether the passing signal was meant for her—she was under obligation to give the alarm signal required by rule 26, and thereafter to act as the emergency might arise. Her duty at this juncture to answer the Etruria's passing signal was as strong as that of the Etruria to give the signal before attempting to pass. The New York, 175 U. S. 187, 204, 205, 20 Sup. Ct. 67, 44 L. Ed. 126.

The conclusion we have reached, under the undisputed proofs, that each vessel was at fault for the collision, makes it unnecessary to determine the speed of either boat immediately preceding the collision, or to consider the other faults attributed by each vessel to the other.

But it is urged on the part of each vessel that the violations of the rules of navigation so appearing on her part could not have contributed to the collision. The fact that a ship was at the time of collision in actual violation of a statutory rule designed to prevent collisions throws the burden upon her to show that such violation could not have contributed to the collision. The Pennsylvania, 19 Wall. 125, 126, 22 L. Ed. 148; The Martello, 153 U. S. 64, 74, 14 Sup. Ct. 723, 38 L. Ed. 637; The Ellis, 152 Fed. 981, 82 C. C. A. 112. Not only can it not be said in the case of either of these vessels that but for her violation of the rules the collision would have occurred solely on account of the fault of the other vessel, but it would seem reasonably probable that, had either vessel observed the duties which we find to have been violated, the collision would not have occurred.

The decree of the District Court will be affirmed. The costs of this court will be equally divided.