## THE CITY OF ERIE.

## THE BELGIUM.

### CLEVELAND & BUFFALO TRANSIT CO. v. GREAT LAKES S. S. CO.

(District Court, N. D. Ohio, E. D. April 4, 1918.)

### No. 2661.

1. COLLISION ☞86—NEGLIGENCE—ENTRY INTO PORT.

A side-wheel steamer, which collided with a steam freighter just inside the main entrance of the Cleveland harbor, *held* culpably negligent because of her rate of speed in entering the harbor, failure to govern her movements after giving two blast whistle signals in accordance with rule 26 (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 649 [Comp. St. 1916, § 7936]), and failure to note and observe the movements and position of the freighter after giving the second two-blast signal.

2. COLLISION ☞76—DISREGARD OF SIGNALS—DUTY.

If a steamer be approaching another vessel, which has disregarded her signals or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty.

3. COLLISION ☞76—COLLISION IN HARBOR—LIABILITY.

A steamer, which failed to answer a second signal of an incoming vessel and was maneuvered across the harbor entrance into the path of the incoming vessel, so that the two collided, *held* culpably negligent; but tugs which towed the steamer from a river into the harbor were not liable, the towlines having parted before the maneuvers were begun, and before the second signal was given.

4. COLLISION ☞69—COLLISION IN HARBOR—VESSEL AT REST.

Though a steamer dropped her anchor and went full speed ahead, in the course of her maneuvers to secure a position in a harbor where she could be coaled, such steamer, as to incoming shipping, is not a vessel at anchor or at rest.

5. COLLISION ☞144—DAMAGES—LIABILITY.

Where two steamers collided, and both were at fault, the fault of each directly and proximately contributing to the collision, the damages should be divided.

In Admiralty. Libel by the Cleveland & Buffalo Transit Company, a corporation, against the steamship Belgium, owned by the Great Lakes Steamship Company; and the steam tugs Dunkirk and Gillmore, owned by the Great Lakes Towing Company, a corporation, with a cross-libel by the Great Lakes Steamship Company against the City of Erie, owned by libelant. The City of Erie and the Belgium con-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

demned, and the damages divided, and the tugs Dunkirk and Gillmore exonerated.

Goulder, White & Garry, of Cleveland, Ohio, for libelant.

Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio, for respondent Great Lakes S. S. Co.

Holding, Masten, Duncan &. Leckie, of Cleveland, Ohio, for respondent Great Lakes Towing Co.

WESTENHAVER, District Judge. The City of Erie, owned by the libelant, the Cleveland & Buffalo Transit Company, was in collision September 7, 1916, at about 8:20 p. m., Eastern standard time, with the steamship Belgium, owned by the respondent, the Great Lakes Steamship Company, both vessels sustaining damage, the liability for which is the subject-matter of this controversy. The steam tugs Dunkirk and Gillmore, owned by the Great Lakes Towing Company, are joined with the Belgium in this libel, they having had the Belgium in tow just prior to the collision, and are charged by the libelant with joint liability for the collision.

The City of Erie is a side-wheel combination passenger and package freight steamer. Her length over all is 524 feet, her extreme breadth at the paddle wheel is about 76 feet, her molded breadth is 44 feet, and her molded depth, 18 feet. She was at this time plying between Put-in-Bay and Cleveland, making daily round trips. The Belgium is a steam freighter, plying between Lake Erie and upper lake ports. Her length over all is approximately 400 feet, her molded breadth 48 feet, and her molded depth 28 feet. The Dunkirk and Gillmore are steam harbor towing tugs, with lengths between perpendiculars of approximately 68 and 71 feet, respectively.

This collision occurred just inside the main harbor entrance at Cleveland. The exact place of collision is in dispute, but it was near the harbor entrance, a short distance east of the west end of the east arm of the breakwater, and not less than 250, nor more than 700, feet southward inside the breakwater wall. The width of the harbor entrance between the east and west arms of the breakwall is 700 feet. Two arms or jetties, connecting a short distance from the ends of the breakwalls, project outwardly into Lake Erie at an acute angle, the outer ends of which are 1,000 feet distant from and in direct line with the ends of the two arms of the breakwall. These outer ends are also 700 feet in width, and constitute the outer entrance to the Cleveland harbor. Upon each end of the east and west arm of the breakwall, and upon each end of the projecting jetties, are pier lights. It was through these outer and inner harbor entrances that the City of Erie was coming on the occasion when the collision took place. Her customary inward course was to port after rounding the west end of the east arm of the breakwater, thence on a northeasterly course to her pier or slip at East Ninth street, about seven-eighths of a mile from the inner harbor entrance.

The Belgium entered this harbor from the south, coming down the Cuyahoga river. She had been taken in tow by the tugs Dunkirk and Gillmore at the Central Furnace, and towed out of the river, stern

first; the Dunkirk being in the lead and the Gillmore following. This river entrance to the Cleveland harbor is through a channel 350 feet in width, with piers on each side thereof. On the north end of each pier is a pier light; the one on the west river pier being in line with the pier light on the east end of the west arm of the breakwater wall, and the one on the east pier being in direct line with the center of the channel of the main harbor entrance from Lake Erie. The north ends of these two piers are distant 1,350 feet from the breakwater wall.

[1] On the occasion in question the Belgium, as she emerged from the river entrance, was winded around by the tugs, stern eastward, into a position parallel to the breakwater wall, at a distance from the north end of the river piers somewhat in dispute, and, when in this position, owing to the action of a considerable sea running in through the harbor entrance, both towlines were snapped. The subsequent movements of the Belgium are clearly established. She backed eastward far enough to clear the incoming sea, then went full speed ahead, fetching up on her anchor, the order to drop which was given immediately following the order "Full speed ahead." She was in this position, with a 20-fathom anchor chain leading astern, when the collision occurred. The exact position reached by her in the harbor while executing these movements is a question much in dispute. The Belgium contends that her bow was then approximately on a line drawn from the east river pier light to the pier light on the west end of the east arm of the breakwater, and approximately 700, certainly not less than 600, feet distant from the breakwater; whereas the Erie contends that the Belgium was farther to the east, and 250, certainly not more than 350, feet, distant from the breakwater. Counsel seem to regard the solution of this disputed question as controlling.

On September 7, 1916, the City of Erie shortly before, or at the time she started to turn southwardly into the outer harbor entrance, perceived the Belgium coming out of the Cuyahoga river. At first only her range light was seen, but shortly thereafter the sailing lights of the lead tug were discovered by the pilot and lookout of the Erie. They testify that they were uncertain whether the Belgium was actually coming out into the harbor, or was tying up at the Pittsburgh dock, just inside the river entrance, but shortly thereafter the situation cleared, so that they perceived she was actually coming out.

At this time, or shortly thereafter, the Erie gave a two-blast whistle signal, indicating that she was directing her course to port. Apparently this signal was given about the time the tugs began to wind the Belgium around. The question is raised as to whether this two-blast signal was in fact given, it being contended on behalf of respondents that only one two-blast signal was given, and that one at a later time. The first two-blast signal seems not to have been heard by the crew of either tug, or by Captain Savage of the fuel lighter Pittsburgh, which was following the Belgium for the purpose of supplying her with fuel. It was, however, heard by Captain Geel and First Mate Little of the Belgium. The testimony of Geel is explicit that this signal was given when the Erie was some distance outside the outer harbor entrance, and at the time the tugs first began to wind the Belgium around. All

the navigating officers of the Erie, a passenger named Smith, and a life guard, named Crapo, heard the signal, and testify as does Captain Geel. I find as a fact that this signal was given at the time and place stated by the navigating officers of the Erie. The exact location of the Erie at this time is. also somewhat in dispute, but the weight of the testimony convinces me that she was then some distance beyond the outer harbor entrance, probably not less than a quarter of a mile therefrom.

Receiving no answer, the Erie nevertheless continued on her course at full speed, without checking until abreast the outer harbor entrance, at which time her engine was checked to what is called "half speed"; that is, from 26 revolutions to 9. This checking, the engineer and captain say, should bring her down to half speed in three boat lengths, or approximately a distance of 1,000 feet. This checking, it will be noted, was not farther than 1,250 feet from the point where the Erie contends the collision occurred.

Shortly after checking the Erie again blew a two-blast whistle signal, to which she received no response. She nevertheless continued on her course without stopping or reversing her engine. She had veered somewhat to the west of the center line of the harbor entrance in order to swing more easily around the west end of the east arm of the breakwall, and her wheel was at some point in the entrance put hard astarboard for this purpose. This maneuver was begun either sooner than was necessary, or the response of the Erie to her wheel was quicker than had been anticipated. As a result, her navigating officers perceived when the Erie was within 50 feet of the breakwall that she might not clear the breakwall, whereupon her ·wheel was eased off to check her swing to port, and later again put hard astarboard.

Her navigating officers testify that her pilot house. was abreast of the pier light when the second maneuver was started, and that the Erie swung around the west end of the east arm of the breakwall very close thereto, some saying as close as 20 feet. ˙ Immediately thereafter, and while this swinging was in progress, the Erie's captain, pilot, and lookout became aware that a collision with the Belgium was imminent, and immediately gave an order to stop and reverse, which order was promptly executed. It was then, however, too late to avoid a collision. The Erie collided at about 10 feet from her bow with the starboard quarter of the Belgium. The stanchions and upper superstructure of the Erie were swept away back almost to the paddle wheel, and the guard of the paddle wheel was raked by the Belgium before the Erie came to a stop. She paused for a few moments only, and then continued to her pier at East Ninth street.

The culpable fault of the Erie is predicated on the rate of speed maintained and the misjudgment and miscalculation of her navigating officers of the effect of her turning movements, and their ·failure to note and observe the position and movements of the Belgium after giving the two signals. It is urged that the speed maintained, coming into a restricted and crowded harbor, was highly negligent, if not reckless; that the Erie not receiving any response to her two signals, should have stopped, and, if need be, reversed, until the situation cleared up; that her navigating officers failed to observe the movements and posi-

tion of the Belgium, but negligently assumed from their observations that the Erie had ample room to swing to port and continue on her customary course between the Belgium and the east breakwater wall without exercising ordinary care to make sure that these movements could be safely executed.

The Erie's rate of speed is disputed. The witnesses called for the Belgium and tugs place her speed at the time of the collision as high as 12 to 15 miles an hour. The witness Crapo, not attached to either vessel, but a life guard officer, occupying a lookout post on the north end of the west river pier, 350 feet south therefrom, and in a good position to observe the movements of both vessels, testifies that her speed was 12 miles an hour. The Erie officers admit that her full speed was 17 to 18 miles an hour, and that this speed was maintained until she was checked down abreast the outer harbor entrance, as already stated. The effect of this checking should have reduced her speed to 8 or 9 miles an hour at the time of the collision, and such is their testimony. In extenuation of the alleged fault in maintaining this rate of speed, and also in not slowing down and stopping or reversing, when no answer was received to her two-blast signals, they urge that weather and other conditions required the maintenance of this rate for safety.

I find from the evidence that the Erie's rate of speed was higher than is contended on her behalf, certainly not less than 10, probably as high as 12, miles an hour, at the time she reversed. Her log for this trip shows an average rate of speed from Cedar Point to the place of collision of approximately 20 miles. This speed was not checked until some 1,200 to 1,500 feet distant from the point of collision, and on the admission of the Erie's navigating officers, it would require three boat lengths, or approximately 1,000 feet, to reduce her speed one-half. Furthermore, on this trip from Cedar Point to Cleveland a severe northwest storm had been raging. The wind, shortly prior to the time in question, had shifted from the northwest to the southwest, but the storm had developed a considerable sea, which continued to roll in from the northwest directly through the harbor entrance. The tendency of this sea would be against a rapid checking of speed. The finding, therefore, of not less than 10 to 12 miles an hour is in accord with the great weight of the evidence.

I also find that the Erie's contention that it was necessary, in view of weather conditions, to maintain this speed through the harbor entrance for purposes of steerage and safety, is not sustained by the evidence. In my opinion, no sufficient reason exists why the Erie should not have checked her speed to 4 miles an hour, upon receiving no answer to her signals, or, in the middle of the outer harbor, could not have stopped and reversed. She could, by checking to 4 miles an hour and holding her head slightly up to the wind, have come in at 4 miles an hour under entire control and with perfect safety. The evidence of Captain Murray, an experienced seaman, to this effect, is convincing, and the more or less guarded 'and qualified opinions to the contrary, expressed by the Erie's captain and by Captain McAlpin, do not, in my opinion, call for a different conclusion.

The Erie was behind her usual schedule. Ordinarily she arrived at 8 to 8:10 p. m. She was carrying passengers and freight to be trans-

ferred at the East Ninth street pier to the Buffalo boat, which was due to sail at 9 p. m. Her practice had been to swing to port without checking to a low rate of speed, as she did that evening, and direct her course diagonally in a northeastward direction to the Ninth street pier. Her navigating officers followed their usual custom. She was not endeavoring to direct her course parallel to the east breakwater, as is contended, but in the usual course to her pier. This is further shown by the angle of collision, which all agree was approximately one of 45 degrees.

Apparently the navigating officers of the Erie paid little or no attention to the movements or position of the Belgium after giving the second two-blast signal. At this time they say they were steering on the Belgium amidship, and that their course lay directly amidships the Belgium until shortly before the collision, at which time, as they testify, the Belgium seemed to be moving astern, and her stern seemed to be moving northward towards the breakwater and closing the gap. Their testimony is significantly silent respecting any observations of the Belgium's movements after giving the two-blast signal until the movement eastward and northward of the stern of the Belgium became evident shortly before the moment of collision.

It seems to me that, after giving the second two-blast signal, they decided the situation was safe, and that the Erie might proceed on her usual course at her high rate of speed directly to the Ninth street pier. Their miscalculation was due, in my opinion, to the starboarding of the wheel too early in the first instance, thus getting so close to the end of the breakwall that she was obliged to ease the wheel and continue farther into the harbor before completing the swing than was customary, and the high rate of speed, at all times maintained, carried her on this course farther from the breakwall than otherwise would have been done. For the consequences of this miscalculation the Erie is responsible.

[2] Upon these facts my conclusion is that the Erie was guilty of culpable negligence, directly contributing to the collision—first, in the rate of speed maintained; second, in failing to govern her movements after giving her two-blast signals in accordance with rule No. 26; and, third, in failing properly to note and observe the movements and position of the Belgium after the second two-blast signal. These conclusions are amply supported by the following authorities: The Corsica, 9 Wall. 630, 19 L. Ed. 804; The City of Paris, 9 Wall. 634, 19 L. Ed. 751; The Syracuse, 9 Wall. 672, 19 L. Ed. 783; The Nevada, 106 U. S. 154, 1 Sup. Ct. 234, 27 L. Ed. 149; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; Hawgood Transit Co. v. Mesaba Steamship Co., 166 Fed. 697, 92 C. C. A. 369. In The New York, supra, it is said:

"Nothing is better settled than that, if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty."

And further:

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the fail-

ure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect. We cannot impress upon the masters of steam vessels too insistently the necessity of caution in passing or crossing the course of other vessels in constricted channels."

[3-5] The conduct of the Belgium and the two tugs remains to be considered. On behalf of the Belgium it is urged that she was a vessel at anchor or at rest, and not under way, at the time the second two-blast signal was given, and was charged with no duty of answering, and, further, that her movements and final position left so much clear space for the Erie to pass on either side of her that her failure to answer or to maintain a lookout did not contribute directly to the collision. On behalf of the tugs it is urged that when the towlines parted their liability for the Belgium's subsequent movements ended, that the duty of answering the second two-blast signal and maintaining thereafter a lookout and keeping away from the Erie was exclusively upon the Belgium, and that the latter's subsequent maneuvers were entirely responsible for her part in causing the collision.

The exact position of the Belgium when the towlines parted, with respect both to the breakwall and to the Erie's position when the second two-blast signal was given, becomes, therefore, vitally important. The Belgium, it clearly appears, passed out between the river piers at a speed of 1½ to 2 miles an hour. Some witnesses place it lower and some higher, but the greater weight of the testimony requires this finding. The Belgium was brought out approximately in the center of the river channel, and, as soon as feasible, approximately when her pilot house was abreast with the river pier light, the tug Dunkirk began winding her around, by pulling to the eastward off her port quarter. The Gillmore assisted this movement by pushing northwesterly across the Belgium's bow. The effect of this operation was to retard the drift astern of the Belgium. It is testified, and I believe correctly, that her speed was thus reduced to not more than one mile an hour by this process of winding. The first two-blast whistle signal was given by the Erie at about the time this winding process began. The great weight of the testimony seems to agree in this respect; certainly Captain Geel and First Mate Little of the Belgium so agree.

This signal, as already stated, was not heard by any member of the crew of the Dunkirk or of the Gillmore, nor by Captain Savage of the fuel lighter Pittsburgh, which was following close behind the Belgium. The Erie was then well out beyond the outer entrance, and the wind was from the southwest, blowing 25 to 30 miles an hour. This distance, velocity, and direction of wind, the situation of the tug crews close to the water's surface, their preoccupation in the performance of immediate duties, and the noise of the tugs' engines and machinery adequately and sufficiently explain their failure to hear the signal. It was, however, heard by both the captain and first mate of the Belgium, and they also noted the failure of either tug to make a reply. The subsequent movements of the Belgium must be considered in the light of their knowledge.

The exact position of the Belgium when the winding process was completed cannot be definitely fixed. Her length being 400 feet, she

must have been brought out a sufficient distance to permit her to be winded around; but, on the other hand, this winding process began while a substantial part of her was still in the river channel. The operation of the stern tug might naturally bring her stern closer to shore; but, again, the lighter Pittsburgh, a twin screw vessel, 165 feet in length, following her, passed through the open space to the west, and was, as her captain says, about 300 feet north and 100 feet west of the pier when the collision happened. The Belgium was probably not less than 400, nor more than 600 feet from the river piers when the towlines parted, and probably not less than 700 to 900 feet distant from the breakwall. Her pilot house, at this time, was approximately on a line due north of the East River pier light, and her bow on a line with the center line of the river channel. That such was her position is also made evident by the fact of the parting of the towline. The towline of the stern tug parted first, and that of the bow tug immediately thereafter. It is agreed that this was due to the rolling of the Belgium in the heavy sea after she had been brought parallel to the ends of the river piers and while the tugs were changing position to stop her further swing. She was therefore yet lying broadside to the sea rolling in through the outer entrance, and receiving its full force. The purpose of the Belgium at this time and prior thereto was to take on fuel from the lighter Pittsburgh under one or the other breakwalls. The duty of the tugs, aside from this matter of fueling, would have been fully performed after winding the Belgium around and throwing her head up to the wind a little farther than when the towlines parted. Neither the tugs nor the Belgium had any understanding respecting the place where fuel was to be taken on, except that all knew it would be done in the harbor, and that it necessarily must be done under either the east or the west breakwall. Evidently it was the intention of the tugs to take her under the east breakwall, although this purpose had not been definitely declared when the towlines parted. Thereafter the Belgium was on her own resources. The towlines were her own, and it is not suggested that their breaking was due in any wise to any fault of the tugs. Captain Geel, it is true, testifies that the master of the Gillmore, when the towlines broke, called to him to back his engine; but he admits that this was what he intended to do, and would have done, even without such a suggestion, and that this suggestion, if made, was not responsible for the subsequent navigation and movements of his vessel.

I am of opinion that no such suggestion was made, and that all movements of the tugs subsequent thereto were undertaken only for the purpose of returning the towlines to the Belgium. The responsibility for all subsequent movements, including failure to answer the second two-blast signal, and to note and observe the movements of the Erie, and to navigate the Belgium in conformity therewith, is wholly upon the navigating officers of the Belgium. As already stated, the testimony is in accord that the second two-blast signal was given after the towlines broke, yet it seems not to have been heard by Captain Geel.

Thereafter the Belgium proceeded to execute this purpose, namely, to move astern far enough to get clear of the incoming sea and to get

into a good position under the east breakwall to take on fuel, and then, with her head to the wind, be able to pass out the harbor entrance into the lake. In accomplishing this the Belgium first backed astern for a period of time and for a distance which cannot be definitely fixed. It is certain, however, that she went astern far enough to clear the incoming sea, and beyond it such a distance that her subsequent movement, full speed ahead until she fetched up on her anchor, did not put her head into the sea. She remained at anchor in this position after the collision until fuel was put aboard. In executing this movement astern, her bow dropped away to port. This was due, according to her officers, to the fact that the wind was against her starboard bow. It was also probably due in a greater degree to the effect of the sea coming in through the harbor entrance against her starboard bow, after her stern had passed out of the sea into calm water. It is undoubtedly true that her stern also, during this backing movement, went farther north and substantially closer to the east breakwall. Captain Geel, observing that this result was following, gave an order for full speed ahead, which order was promptly executed. At the same time he gave an order to drop anchor, which was expeditiously executed, but, obviously from the movements necessary to accomplish it, required a longer time than to execute the order for full speed ahead. Twenty fathoms or 120 feet of anchor line were dropped, and the vessel had moved ahead and fetched up on that anchor line when the collision took place. The lake depth at low water in the harbor is only 21 feet. She went ahead also on a port wheel, which would have a tendency of carrying her bow closer to the breakwall. It is probable that the net result of these movements would place her some distance closer to the breakwall than she was when the towlines parted. At the time of the collision her engines were working full speed ahead, and she was still carrying sailing lights, and not displaying anchor lights. The contention that she was a vessel at anchor, or at rest, and not under way, is contrary to the actual fact.

Upon these facts my conclusion is that the tugs were not guilty of any culpable negligence directly contributing to the collision. Their fault, if any, is too remote. I am, however, of opinion that the Belgium was guilty of culpable negligence contributing directly to the collision. She paid no attention to the two-blast signals; indeed, paid so little attention that she did not hear the last. She kept no lookout either astern or forward during these maneuvers. She knew the Erie, or some steamer, was coming in, but took no precaution to observe how or where it was to pass her. Her navigating officers were in as good position to observe what the Erie was doing, and were charged with as high a degree of care so to observe and to guard against possible danger from her, as the Erie was to observe and guard against danger from the Belgium. Her navigating officers maneuvered her around in these constricted waters, across the harbor entrance, into the path of an incoming steamer, apparently either oblivious or careless of all possible consequences. It is no sufficient excuse to urge that the Erie was free to pass the Belgium's bow, for such was not the Belgium's position when her officers heard the first and should have heard the second

signal. It is no sufficient excuse that more careful navigation of the Erie might have avoided an accident, notwithstanding the Belgium's negligence, by slipping through the clear space between the Belgium and the breakwall. Her officers cannot in this way be excused of the fault of crowding across the channel and course of an incoming steamer, and crowding the navigable space of a steamer which had signaled her intention to take that course.

It is not necessary to find that the Belgium was as close as 250 or 350 feet from the breakwall at the time of the collision, nor that she was then moving eastward and her stern northward, closing in the gap. This movement had undoubtedly been suspended before the collision, probably before the Erie's officers became aware that a collision was imminent. The Belgium could not, in my opinion, be exonerated, even if she were as far distant from the breakwall as 600 or 700 feet, and, in my opinion, she was as close thereto as the lesser figure. The doctrine that, where one vessel's fault is clear, a mere suspicion that another is not free from fault is not sufficient to condemn the latter, has no application in this situation. The fault of both vessels is of the same kind and degree, and the fault of both contributed directly and proximately to the consequences. These conclusions are supported by the following authorities: Hawgood Transit Co. v. Mesaba Steamship Co., 166 Fed. 697, 92 C. C. A. 369; Pittsburg Steamship Co. v. Duluth Steamship Co., 222 Fed. 834, 138 C. C. A. 260; The Britannia, 153 U. S. 130, 143, 14 Sup. Ct. 795, 38 L. Ed. 660.

My judgment is that both the Erie and the Belgium should be condemned, and the damages divided, and that the tugs, the Dunkirk and the Gillmore, should be exonerated.