**GREAT LAKES TRANSIT CORPORATION v. INTERSTATE S. S. CO. (MILKO et al., Interveners).***

No. 6911.

Circuit Court of Appeals, Sixth Circuit.

June 5, 1936.

Rehearing Denied Nov. 7, 1936.

*Writ of certiorari granted 57 S. Ct. 512, 81 L. Ed. —.

John B. Richards and David S. Jackson, both of Buffalo, N. Y. (Brown, Ely & Richards and Laurence E. Coffey, all of Buffalo, N. Y., on the brief), for appellant.

T. H. Garry, of Cleveland, Ohio, and Ray M. Stanley, of Buffalo, N. Y. (Duncan, Leckie, McCreary, Schlitz & Hinslea and Frederick L. Leckie, all of Cleveland, Ohio, and Stanley & Gidley, Ellis H. Gidley, and Arthur E. Otten, all of Buffalo, N. Y., on the briefs), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Interstate Steamship Company, owner of the steamer Willis L. King, brought suit against Great Lakes Transit Corporation, owner of the steamer George D. Dixon, for $46,864.35, damages for negligence leading to a collision between the two steamers in the St. Clair river.

The Transit Corporation denied that the Dixon was negligent and brought a counterclaim against the King and its owner for $120,000 on behalf of itself and as bailee of the damaged cargo. The Interstate Company then impleaded the Transit Corporation as the owner of the Dixon under the Fifty-Sixth Admiralty Rule to answer the cargo claim in the second case. John Milko, a seaman on the Dixon, who was injured, intervened in the second suit.

The court heard the cases as a consolidated cause, found that the collision resulted from the fault of both vessels, divided the damages and costs, and appointed a special master commissioner to determine and report the amount of damages sustained, including damages to the owner of the Dixon as bailee of cargo, and damages for personal injuries to Milko. While the cause was pending before the master commissioner, the Atlantic Mutual Insurance Company filed an intervening petition as insurer and underwriter of the cargo of the Dixon against the King and the Interstate Company and sought a decree for $6,401.57, the amount it had paid for damages to cargo, and for further undetermined sums for which it was liable. It was stipulated that this petition should for all purposes stand as an intervening petition of fourteen other underwriters which had issued insurance aggregating $1,100,000 under similar policy conditions. The Transit Corporation and the Interstate Company filed answers and the facts were stipulated for the purpose of permitting the court to pass upon the rights of the intervening underwriters.

The court found that the cargo owners were the beneficiaries of the insurance and entered an interlocutory decree against each vessel and its owners for a moiety of the damages sustained by cargo on the Dixon, with provision for recovery from either of any deficiency not collectible from the other, and directed the master commissioner to determine and report the amount of the cargo damage.

The Transit Corporation appealed. It complains of the findings that the Dixon as well as the King was at fault; that the in-

surance was taken out to protect the cargo owners; and that it must therefore pay a moiety of the cargo damages.

■ On August 11, 1933, at 4:53 p. m., the King (580 feet long, 58 feet beam, 32 feet deep, and drawing about 18½ feet) passed Port Gratiot lightship at the foot of Lake Huron and entered the St. Clair river, bound down the lakes with a cargo of ore. The course of the river at its source was slightly west of south, then slightly east of south, and at its junction with the Black river in Port Huron veered again to slightly west of south. The current at this point was about two miles per hour and toward the Canadian shore.

At the same time, the steamer Dixon (350 feet long, 46 feet beam, and 30 feet deep, and drawing 10 feet forward and 16 feet aft) was proceeding up the river below Port Huron, bound with a cargo of package merchandise from Buffalo to Milwaukee.

The point of collision, as fixed by both captains, was approximately a mile below the mouth of the Black river and slightly east of the middle of the river upon the Canadian side of the international boundary. It is more definitely located as slightly below the Canadian docks of the Imperial Oil Company.

Capt. Watts of the King testified that when he passed the traffic buoy just above the mouth of the Black river, which marked the separation of routes for upbound and downbound traffic, his engine was going full speed; that this would give the King a speed of 11½ miles per hour in deep water; and that although the shallow water of the river would retard it somewhat, still, with the aid of the current, his boat was making more than 9 miles per hour.

Bulletin No. 42, Survey of Northern and Northwestern Lakes, issued by the War Department Corps of Engineers, in April, 1933, promulgated two rules for the navigation of this part of the St. Clair:

"Rule 1. All downbound vessels navigate the American channel. All upbound vessels shall navigate the Canadian channel. * * * "

"Rule 2. The speed of vessels navigating these channels shall not exceed 9 miles per hour."

Watts testified that just below the Black river the weather, which had been clear, set in with a violent rain squall and wind, and that just then he heard a fog signal of a vessel down the river, and that he immediately blew a fog signal of three blasts and check-

ed to half speed; that visibility was reduced to 900 or 1000 feet and appeared to be worse farther down the river, though both banks were visible at all times.

He further testified that he heard only one fog signal and that he blew a two-blast passing signal, indicating that he was directing his course to port (the Canadian side), and calling for a starboard passing; that thirty or forty seconds later he blew a second two-blast signal and received no answer, but that the Dixon then became visible 1,200 to 1,500 feet away on his starboard bow and in alignment for a starboard to starboard passing.

Watts further testified that he was on the Canadian side of the river and about 500 feet offshore, with his course trained on the Mueller plant (Canadian) about 1½ miles away, when he blew a third two-blast whistle, after which the Dixon moved to its starboard and across the King's bow. Both the first mate and the wheelman of the King testified that the King blew three two-blast passing signals. The watchman testified that he heard at least two two-blast passing signals. The mate heard no fog signal from either vessel. None of the King's crew testified to hearing any signal from the Dixon other than the first fog signal.

Watts testified that because of the storm and low visibility he went to the Canadian side in order to turn and anchor on the American side. As soon as the Dixon was seen to move to starboard, the King backed full speed, blew a danger signal and a two-blast passing signal, but the Dixon kept coming across her bow and the King's bow struck the Dixon at a point about 143 feet from her stem on her port side. The weight of the evidence is that the collision took place about 5:40 p. m. The Dixon continued across the King's bow to the Canadian shore, and the King kept backing in order to stand by if needed.

Capt. Goodberry of the Dixon testified that when he was about a half mile below Reed's Dry Dock (marked "R" on Appellant's Exhibit A and shown on libelant's Exhibit I as the lagoon) and slightly on the Canadian side, he saw a cloud coming from the west and that it began to rain; that he immediately ordered the speed checked so that when he passed the dock he was going about two miles per hour or one-half mile faster than steerage way.

The engineer, assistant engineer, and oiler of the Dixon testified that her engines were checked before the collision. Their es-

timates of the intervening time varied from eight to fourteen minutes. The engineer's log showed the check at 5:25. Goodberry testified that he blew the first fog signal a couple of minutes after the check; that visibility was cut down but that he could always see the Canadian shore; that when he was about opposite Reed's Dry Dock he heard an answer upstream and then blew a second fog signal; that right after that he heard a one-blast signal (for a port to port passing) from up the river, which he answered and ported half a point. He then blew another fog signal and heard a second one-blast signal ahead which he answered, after which he ported a point. He then blew another fog signal which was answered by a third one-blast signal. He answered with one and told the wheelman to port again and "keep her coming." The rain and fog lasted three or four minutes and was nearly over when he saw the King. The next thing he heard was five short whistles, and he looked and saw the King's light on his port side and about 400 feet from the Canadian shore and almost abeam. He testified that the King then gave two whistles and came out of the fog not more than 400 or 500 feet away, but seeing that there was no chance of "giving him what he asked for" (a starboard to starboard passing) he blew one whistle and called out "hard aport." He testified that while he was thus headed for the Canadian shore the King came down the river pretty well over on the Canadian side, and struck the Dixon on her port side, at right angles; that the Dixon then ran full speed ahead, then reversed, checked, and anchored on the Canadian side.

Coffield, the mate of the Dixon, and Lemke, who was on watch, confirmed in every particular Goodberry's account of the whistles of both ships and their sequence.

Dr. Francois, an outside witness, testified for the King. He testified that he was on the point of the Foundation Company's slip, 20 or 25 feet north of the steamer Spokane, which was moored there. This was near Reed's Dry Dock. He testified that he saw the Dixon, as the storm came on, just east of midstream, and that it was going 12 to 14 miles an hour; that it blew one blast and disappeared into the storm; that he then heard a three-blast fog signal and then another three-blast signal which seemed to be from different whistles.

Capt. Geel, who was master and mate on the ferries running between Port Huron and Sarnia on the Canadian side, testified that he saw the Dixon pass his home in Port Huron and heard her blow her fog whistle and a one-blast passing signal three times soon after the storm struck the locality.

Capt. Conlin, a master of 26 years' experience and in charge of barge repairing at the Wolverine Dry Dock, on the American side, a short distance north of the point of collision, testified that he left the dock about 5:30 and was driven north in an automobile; that the occupants of the car were caught in the storm and stopped for a few minutes, at which time he heard a chime whistle blow one blast; that after the weather cleared a little he drove on and again heard a chime whistle answered by a coarser whistle; that soon after he left the car and while he was standing under an awning about a mile north of the Wolverine dock, and about ten minutes after hearing the first whistle, he heard a chime whistle blow five or more blasts down the river. It is undisputed that the King had a chime whistle and the Dixon a coarser one.

Ernest Brewer, caretaker of the Spokane, testified that he heard a one-blast signal from the King, answered by the Dixon. There were other witnesses for appellant, sailors on the Dixon, who confirmed the testimony that one-blast passing signals were exchanged at least twice before the collision. These men also spoke of a two-blast signal from the King just before the accident.

We cannot accept the evidence of the King that the Dixon blew only one fog signal. There is every reason to believe that she not only blew several fog signals but also answering blasts to the King's passing signals. The weight of the evidence undoubtedly is that the course of the King was towards the Canadian side even though blowing one-blast signals, and no reason occurs to us why the King should not have heard the signals from the Dixon.

Capt. Watts' statement that he went to the Canadian side to turn his vessel is not convincing. There seems to have been no sufficient reason for that maneuver.

The court found that the King was at fault in not blowing an alarm and reducing speed when it found itself on the Canadian side in the neighborhood of another vessel which it could not see, in violation of rules 15 and 26 (Pilot rules for the Great Lakes and other connecting and tributary waters, 33 U.S.C.A. §§ 272, 291), which prescribed that a steamer shall on hearing the fog signal of another vessel, apparently not more than four points from right ahead,

reduce her speed to bare steerage way. We are in agreement but would lay additional emphasis on the King's speed in excess of nine miles an hour in violation of rule 2 for navigation of this part of the river.

*As to the negligence of the Dixon:* Lemke, the lookout, standing watch on its forecastle head, testified that after the second one blast from the King, he reported to the captain a ship about a half point off the starboard bow, having *seen* the flash of its diamond light. He again saw this flash after the third one-blast signal from the King. The light had then swung to the port side of the Dixon and he so reported it, but the Dixon was then porting heavily, was swinging across stream, and was losing speed, and it might have apprehended from the position of the King's light that, even though it was then on the port side, the King was not in position to pass safely, as of course it was not. It was after this third one-blast signal from the King that Goodberry ordered his wheelman "to port again and keep her coming." The Dixon could not, we think, absolve itself from blame by acting on the second one-blast signal from the King, when, in so doing, it is clear she ignored information of a contradictory nature—the first flash of the light.

Granting that the King was being very badly navigated, still there is the testimony of the Dixon's own witnesses that this fact was brought home to the Dixon after the King's second one-blast passing signal, her flash showing her still to be on the Dixon's starboard.

Pilot Rule II and Navigation Rule 26 would seem to bear on such a situation. The first reads in part: "Rule II. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously or from other causes, the pilot so in doubt shall immediately signify the same by giving the DANGER SIGNAL of five or more short and rapid blasts of the whistle; and if both vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway, and, if necessary, stopped and reversed, until the proper signals are given, answered and understood, or until the vessels shall have passed each other." And the second: "Rule 26. If the pilot of a steam vessel to which a passing signal is sounded deems it unsafe to accept and assent to said signal, he shall not sound a cross signal; but in that case, and

in every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes, the pilot of such steamer so receiving the first passing signal, or the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to bare steerageway, and, if necessary, stop and reverse."

It seems reasonably certain that the Dixon was going very slowly at the time of the collision. But it is also clear that Capt. Goodberry was in possession of information, or should have been, that should have raised doubts in his mind as to the intention of the King, namely, the knowledge that the King was still on his starboard bow, even after the second port to port passing signal. Had he observed either rule quoted above, he might not have averted the collision but a danger signal would have put the King on its guard. He could not forego any precaution on his part simply because the King was being badly navigated. The failure to blow a danger signal, in the face of the King's palpable confusion in blowing a second port to port passing signal when it was still in line for a starboard passing, was negligence. Pittsburgh S. S. Co. v. Duluth S. S. Co., 222 F. 834, 835 (C.C.A. 6); Hawgood Transit Co. v. Mesaba S. S. Co., 166 F. 697, 701 (C.C.A. 6). See The North Star, 62 F. 71 (C.C.A. 6); The San Simeon, 63 F.(2d) 798 (C.C.A. 2); The George W. Roby, 111 F. 601 (C.C.A. 6). We think the court correctly found both vessels at fault.

*As to the second question,* i. e., whether the cargo insurance was payable to the owners of the Dixon as carrier, or as bailee or trustee of the cargo for the owners:

The gist of the Transit Corporation's answer to the intervening petition was that the policies of insurance were intended to, and did, insure and indemnify it against liability assumed by it to cargo owners for loss or damage, and that though the insurers had the cargo owner's right by subrogation against the King for a moiety there was no such subrogation against the Transit Corporation, since it was this very type of loss against which the insurers had agreed to indemnify it.

The King in its answer asked that its rights be preserved and that a decree be en-

tered, showing that the King and the Dixon were mutually at fault and dividing the damages and costs equally between the owners of the steamers.

In the absence of legislation, the Dixon's liability to cargo owners was absolute, being equivalent to that of an insurer. The Maggie Hammond, 9 Wall. 435, 444, 19 L.Ed. 772. This liability was modified by the Harter Act (46 U.S.C. §§ 190–195, 46 U.S.C.A. §§ 190–195), but under section 9e of the Uniform Bill of Lading, approved by the Interstate Commerce Commission, and here used by the shippers and the Dixon, the saving clauses of the Harter Act might be waived or modified if the property was carried under a tariff which provided that the carrier should be liable for loss from perils of the sea.

Without going into a detailed analysis of the eleven tariff schedules under which the Dixon's cargo was carried, it seems clear that each of them was so worded as to waive the provisions of the Harter Act. These tariff schedules fall into three classes: In the first class, under the heading "Marine Insurance" are the words "Rates Named Herein Include Marine Insurance" and then follows: "Rule No. 15. While shipments subject to rates named herein as including marine insurance are water borne at and between lake ports on the vessels of the Great Lakes Transit Corporation, said corporation assumes liability for loss or damage to said shipments caused by marine perils, to wit—of the seas, and lakes, fire, collision, etc."

In the second class, subdivided into two, under the headings, "Governing Marine Insurance on Rail and Lake Traffic" and "Marine Insurance," there was a specific assumption of liability (as above) but no express statement that rates include marine insurance.

In the third class the schedules contain the statement that "rates named in this tariff include marine insurance while in the possession of the Great Lakes Transit Corporation, or other named lake steamers" and then the provision: "Liability of Carriers When Rates Include Marine Insurance. Property moving under rates named or provided for in this tariff while in the custody of the water carriers from the time they receive it * * * is insured: While water borne against the perils of the seas * * * collisions * * *."

These were the terms and conditions upon which appellant agreed to carry cargo and the owners would naturally conclude that their property was to be covered by policies of marine insurance (The Grecian [D.C.] 8 F.Supp. 580, 582), and we think the policies in suit were procured by appellant in compliance with its contracts and were issued primarily for the benefit of cargo owners.

It is true that in the opening paragraph of the policies appellant is the nominal insured, but there follows the significant words "for account of whom it may concern;" then the phrase "loss to be paid * * * to Great Lakes Transit Corporation or order."

For the effect of these and similar phrases, see Buck v. Chesapeake Ins. Co., 1 Pet. 151, 160, 7 L.Ed. 90; Munich Assur. Co. v. Dodwell & Co., 128 F. 410, 414 (C.C.A. 9); Symmers v. Carroll, 207 N.Y. 632, 637, 101 N.E. 698, 47 L.R.A.(N.S.) 196, Ann.Cas. 1914C, 685; Virginia-Carolina Chemical Co. v. Chesapeake L. & T. Co., 279 F. 684 (C.C.A. 2).

Then follows the coverage, described as, "On First Interest as per form attached." This form repeats the phrase, "for account of whom it may concern," and continues, "loss, if any, payable to Great Lakes Transit Corporation or order." The specific coverage is upon "any cargo per vessels sailing from initial port prior to December 12, 1933, midnight (Chicago time) until Great Lakes Transit Corporation's responsibility therefor ceases." The coverage continues: "On cargo of any kind owned by the assured and on the assured's liability to others in respect to cargo of any kind covering same from time said Great Lakes Transit Corporation becomes responsible therefor and until its responsibility ceases. * * *"

Again, the policy provides, "and also the insurance of said *cargo against perils of the seas and lakes*"; and, further, "and for any and all claims which said *cargo may be called upon to contribute in general average*." (Italics ours.)

The policy contains the following further provision: "Liability under this policy for any loss or losses, claim or claims, arising in respect to each cargo while on board of each the above named steamers, and/or substituted steamers * * * including connecting water conveyances or in respect to cargo while on docks, wharves or elsewhere on shore as the result of any one occurrence is hereby limited * * *."

There is a provision covering damages to shipments in refrigerators and the usual

**746**

standard "sue and labor" clause. It would also seem, as indicated by the District Judge, that the phrase "on the assured's liability to others in respect to cargo" would protect cargo owners against a breach of appellant's obligation to furnish marine insurance for which the owners had agreed to pay a higher rate.

Appellant relies upon the following clause found in each of the policies: "The Assured" (the Transit Corporation) "taking upon themselves as to said cargo or parts thereof, * * * the insurance of said cargo against perils of the seas and lakes * * * and the said Assurers agree and undertake to indemnify * * * said Assured * * * to the extent to which the Assured may be held liable by the owners thereof under any liability the Assured shall have assumed as common carriers, insurers, or otherwise * * *." But this clause does not avail appellant because it did not take upon itself the insurance of cargo or assume any liability with reference thereto as an insurer. Its obligation as to insurance went no further than to require it to procure policies of insurance from others. We think the parties could not have failed to understand that these policies were issued primarily for the benefit of cargo and that the payments made and to be made by the underwriters were in settlement of their liability to cargo owners. It follows that, under general principles of equity, the underwriters were entitled by subrogation to all the rights of the cargo owners to recover the amounts paid. Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 462, 9 S.Ct. 469, 32 L.Ed. 788; Mason v. Marine Ins. Co., 110 F. 452, 456, 54 L.R.A. 700 (C.C.A. 6); Federal Ins. Co. v. Detroit Fire & Marine Ins. Co., 202 F. 648, 651 (C.C.A. 6). And their claims may be prosecuted by intervention. Mason v. Marine Ins. Co., supra; Federal Ins. Co. v. Detroit, etc., Ins. Co., supra.

The court having, as we think properly, found that the collision was caused by both the King and the Dixon, there was no error in decreeing a recovery in behalf of the underwriters for a moiety of the payments made, and to be made, by them on account of loss to cargo, with the provision that any balance uncollectible from one should be paid by the other.

It is urged that there is no basis for such a decree against the Dixon because the intervening petitions of the underwriters sought relief against the King and its owners only. This objection is without merit for appellant treated the intervening petitions as a sufficient basis for relief and stipulated the facts for the express purpose of permitting the court to pass upon the rights of the intervening underwriters "in so far as concerns the form of interlocutory decree to be entered."

The decree is affirmed.